IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DANIEL MOORE, et al.          :     CIVIL ACTION
                              :
          v.                  :
                              :
JOHNSON & JOHNSON, et al.     :     NO. 12-490

MEMORANDUM

McLaughlin, J.                           November 1, 2012

          This personal injury and wrongful death action arises
out of injuries allegedly suffered by the plaintiffs' son after
he ingested a dose of the over-the-counter medication,
Children's Tylenol.  The Children's Tylenol was produced by
McNEIL-PPC, Inc. ("McNEIL-PPC") at its Fort Washington,
Pennsylvania production facility.  The plaintiffs allege that
their son's injuries and eventual death are directly
attributable to quality control problems and defective
production at the Fort Washington plant.

          On December 29, 2011, the plaintiffs, Daniel and Katy
Moore, filed suit in the Pennsylvania Court of Common Pleas
against seventeen defendants, asserting twelve separate claims
all stemming from the death of their son, River.  Among those
named as defendants in the Moores' lawsuit are McNEIL-PPC,
McNEIL-PPC's ultimate parent corporation, Johnson & Johnson
("J&J"), and J&J executives William C. Weldon ("Weldon") and

Rosemary Crane ("Crane"), as well as Costco Wholesale Corporation ("Costco"), the corporate owner of the store that sold Ms. Moore the purportedly defective bottle of Children's Tylenol.[1]

Several of the defendants, including J&J, McNEIL-PPC, Costco, and Weldon, jointly filed a notice of removal to this Court on January 30, 2012, to which other defendants consented. Crane neither joined in nor consented to the notice of removal. Removal was premised on this Court's diversity jurisdiction under 28 U.S.C. § 1332.

On February 14, 2012, the plaintiffs moved to remand the case to the Court of Common Pleas of Philadelphia County. The plaintiffs argue that removal is improper for several reasons: (1) McNEIL-PPC is a citizen of Pennsylvania and, under the "forum defendant" rule, is barred from removing a Pennsylvania state court action to a federal court sitting in that state; (2) Weldon and Crane are also citizens of Pennsylvania, similarly preventing removal under the "forum defendant" rule; (3) Costco, like the plaintiffs, is a citizen of Washington, defeating complete diversity among the parties;

---

[1] The plaintiffs' verified complaint also names as defendants two divisions of McNEIL-PPC, additional J&J executives, members of J&J's board of directors, and third-party corporations that allegedly provided market assessments related to McNEIL-PPC product recalls.  These defendants are not relevant to the Court's decision.

and (4) because Crane did not join in or consent to removing this case, the defendants have failed to comply with the requirement that consent to removal be unanimous among defendants.

The defendants contend that removal is proper and argue that (1) McNEIL-PPC is actually a citizen of New Jersey and may remove a Pennsylvania state court action to this Court; (2) forum defendants Weldon and Crane were fraudulently joined and their citizenship should not be considered for removal purposes; (3) Costco was fraudulently joined and its non-diverse citizenship does not deny this Court subject matter jurisdiction; and (4) Crane's consent to removal was unnecessary, either because she was fraudulently joined or because she had not been properly served with the summons and complaint when the removing defendants filed their notice of removal.

The Court will deny the plaintiffs' motion to remand.

I.   Factual Background

The facts herein discussed are those necessary to determine the citizenship of McNEIL-PPC and the sufficiency of the plaintiffs' claims against Weldon, Crane, and Costco on a fraudulent joinder inquiry.  The facts relevant to McNEIL-PPC's citizenship are drawn from unchallenged affidavits, deposition

testimony, and exhibits submitted by the parties and constitute the factual findings of the Court.  Any factual disputes are noted.  Other facts are drawn from the assertions in the plaintiffs' verified complaint, which the Court must assume to be true when conducting a fraudulent joinder analysis.  <u>In re Briscoe</u>, 448 F.3d 201, 217 (3d Cir. 2006).

A.   <u>McNEIL-PPC's Activities and Corporate Structure</u>

McNEIL-PPC is a wholly-owned subsidiary of J&J.[2]  It is one of several J&J subsidiaries that make and sell a number of consumer products.  The McNeil Consumer Healthcare Division of McNEIL-PPC makes and distributes over-the-counter ("OTC") medications, such as Tylenol, Motrin, and Benadryl, and operates out of a facility in Fort Washington, Pennsylvania.  McNEIL-PPC's other divisions and business units produce and distribute a variety of other products, such as Listerine mouthwash, Reach dental products, feminine hygiene products bearing the OB, Stayfree, and Carefree labels, and Rogaine.  Corporate executives who manage these non-OTC brands are based in Skillman, New Jersey.  Individuals working at J&J's Morris Plains, New Jersey campus also perform work related to some of

---

[2] J&J indirectly owns McNEIL-PPC through several intervening subsidiaries.  Vaswani Supp. Decl. ¶ 5; 5/2/12 Vaswani Dep. 63-64.

these consumer products.  Vaswani Supp. Decl. ¶¶ 3, 5; 5/8/12 Vaswani Dep. 52-53, 55-56, 68.

McNEIL-PPC has 40 officers.  Thirty of those officers are located at corporate facilities in New Jersey: 23 are at J&J offices in New Brunswick, and the rest work out of Skillman and Morris Plains.[3]  Three of McNEIL-PPC's highest-ranking officers are based at its Fort Washington facility: President Denice Torres; Vice President/Chief Financial Officer Kirk Barton; and Secretary Shane Freedman.  The office location of McNEIL-PPC's fourth senior officer, Treasurer Gregory Herlan, is unclear. His office is either in Skillman, New Jersey or Fort Washington, Pennsylvania.[4]  Vaswani Decl. ¶ 6; 5/2/12 Vaswani Dep. 65-66, 72-76; 5/8/12 Vaswani Dep. 43-44.

McNEIL-PPC's bylaws vest Denice Torres, as president, with "general charge and supervision of the business of the Corporation."  Pls.' 5/21/12 Supp. Br., Ex. C.  Torres also

---

[3] There is no evidence in the record as to the office location for five McNEIL-PPC officers, and there is a factual dispute as to the location of offices for Treasurer Gregory Herlan and Assistant Treasurer Laurie Pearce.  See 5/2/12 Vaswani Dep. 65; 5/8/12 Vaswani Dep. 40-44; Pls.' 5/21/12 Supp. Br., Ex. D.

[4] McNEIL-PPC Assistant Secretary Raj R. Vaswani testified at deposition that Herlan's main office is in Skillman, New Jersey. 5/2/12 Vaswani Dep. 65; 5/8/12 Vaswani Dep. 43-44.  The J&J corporate directory also states that Herlan's business address is in Skillman.  Pls.' 5/21/12 Supp. Br., Ex. A.  A business record on file with the State of New Jersey lists an address for Herlan in Fort Washington.  Id., Ex. D.

serves as president of the McNeil Consumer Healthcare Division.
Her actual management responsibilities are limited to that
division.  She directs and coordinates activities, such as
marketing, only with respect to the OTC products manufactured by
McNeil Consumer Healthcare.  As a practical matter, McNEIL-PPC's
vice president/CFO, Kirk Barton, also only manages the brands
within the McNeil Consumer Healthcare Division.  5/2/12 Vaswani
Dep. 71, 89-91; 5/8/12 Vaswani Dep. 60.

        The bulk of the management functions for McNEIL-PPC
and other J&J subsidiaries that produce consumer products are
carried out by executives associated with J&J's Family of
Consumer Companies ("FCC"), an operating group consisting of
J&J's consumer businesses.  The FCC is overseen by a Group
Operating Committee ("GOC") that exercises high-level direction
for the corporate entities within the sector.  Roberto Marques,
who sits on the GOC as company group chairman of the FCC in
North America, has "overall responsibility for the consumer
business in North America."  Marques' office is in Skillman, New
Jersey.  J&J's internal directory states that Torres reports to
Marques.  5/2/12 Vaswani Dep. 103-06, 138-41; 5/8/12 Vaswani
Dep. 76-77; Vaswani Supp. Decl. ¶¶ 6, 8; Pls.' 5/21/12 Supp.
Br., Ex. A.

        Several other senior managers within the FCC, working
from offices in Skillman, assist with the coordination and

oversight of various aspects of J&J's consumer businesses. These executives, Roberto DiBernardini, Caitlin Pappas, and Larry Montes, are in charge of human resources, sales, and compliance, respectively, for the FCC in North America. A fourth, Gregory Herlan, directs and oversees the financial operations of the consumer businesses. As previously noted, the location of Herlan's office is uncertain. These four executives meet regularly with North American Company Group Chairman Roberto Marques in Skillman. With the exception of Herlan, who is McNEIL-PPC's treasurer, none of the senior executives running operations for the FCC are officers of McNEIL-PPC, nor are they employees of that particular corporation. They are employed by other J&J entities. 5/2/12 Vaswani Dep. 103-06, 112-15; 5/8/12 Vaswani Dep. 75; Vaswani Supp. Decl. ¶¶ 6, 8-12; Pls.' 5/21/12 Supp. Br., Ex. A.

B.   McNEIL-PPC's Production of OTC Products[5]

J&J and McNEIL-PPC have a history of quality control problems dating back at least ten years. Beginning in 2002, J&J

---

[5] As stated above, the following recitation of facts is based on the allegations in the verified complaint. Because this case arises out of injuries allegedly suffered by River Moore and his parents following his ingestion of Children's Tylenol on July 22, 2010, the Court need not discuss assertions in the verified complaint that relate to the defendants' actions after that date and are, therefore, irrelevant to the Court's analysis of the instant motion to remand. See Compl. ¶¶ 11, 178-84.

management undertook cost-cutting measures in quality control
and production oversight to enhance corporate profits.  J&J
terminated experienced quality control staff and replaced them
with inexperienced contract workers.  These cost-cutting
measures led to lax oversight of production at J&J's facilities,
including those run by McNEIL-PPC.  Compl. ¶¶ 63-66, 73.

Quality control issues at McNEIL-PPC facilities also
resulted in the Food and Drug Administration ("FDA") issuing
reports critical of the company.  For instance, in 2004, the FDA
issued a report citing McNEIL-PPC's failure to conduct complete
investigations and to maintain proper sampling practices and
recordkeeping.  Successive FDA reports in 2008 and 2009 also
described problems with McNEIL-PPC's investigatory practices.
On April 30, 2010, the FDA reported twenty "observations" of
deficiencies in quality control and production operations at
McNEIL-PPC's Fort Washington facility.  Compl. ¶¶ 67, 78-79,
153-58.

On April 30, 2010, McNEIL-PPC also issued a recall of
approximately 40 types of children's and infant liquid
medications, including Tylenol, due to "filth and contamination"
at the Fort Washington, Pennsylvania production facility.  The
recalled medication had "particulate contamination," and some of
the products had an elevated concentration of the active
ingredient.  The recall, encompassing over 136 million bottles

of product, was "the largest recall of children and infant
medicine in history."  In addition to the recall, J&J and
McNEIL-PPC shut down operations at the Fort Washington plant.
Compl. ¶¶ 120-22, 163.

Following this recall, the House Committee on
Oversight and Government Reform held two congressional hearings
into J&J's activities.  At the second hearing, on September 30,
2010, William C. Weldon, then chairman and CEO of J&J,
testified.  He apologized for J&J's failure to maintain "high
quality standards" with respect to its children's and infant
products and attempted to minimize the danger posed by J&J
products then on the market.  Compl. ¶¶ 163-73 (quotation marks
omitted).

The April 2010 recall was one of several McNEIL-PPC
recalls issued between July 2009 and July 2010 due to quality
control problems.  The first occurred on July 9, 2009, when
McNEIL-PPC publicly recalled 88,000 packages of Motrin IB.
Sometime earlier, McNEIL-PPC tried to remove the defective
Motrin IB from the market through a "phantom" or "stealth"
recall, in which it hired third-party contractors to purchase
the drug from retailers' shelves.  This "phantom" recall was
effectuated "without notification to the customers or the
retailers."  Compl. ¶¶ 83, 85-88, 93-95, 98.

Next, in August or September 2009, J&J and McNEIL-PPC issued a formal recall of nearly 8 million bottles of liquid adult and Children's Tylenol products due to suspected bacterial contamination.  This recall did not include all Infant and Children's Tylenol products.  In September, McNEIL-PPC wrote a letter to healthcare professionals explaining that certain Children's Tylenol products were being recalled because of potential adulteration by the bacteria B. cepacia.  In describing the recall on the Tylenol website, McNEIL-PPC did so without mention of the bacterial contaminant.  Compl. ¶¶ 100-01, 104-10.

Between November 2009 and July 2010, McNEIL-PPC also issued and expanded a recall of various products in pill form that had a "musty, moldy odor[]" linked to contamination by a pesticide used in storing and transporting the medication's packaging materials.  The products implicated by this recall were manufactured at McNEIL-PPC's Las Piedrad, Puerto Rico facility.  Neither this recall nor the July 2009 Motrin IB recall appears to have involved liquid Children's Tylenol products.  Compl. ¶¶ 111, 113, 115-19, 126-29.

C.    Involvement of Weldon and Crane

Weldon and Rosemary Crane, a former company group chairman at J&J, had personal knowledge of the poor conditions

at J&J's manufacturing facilities, including the Fort Washington plant.  According to the verified complaint, Weldon and Crane were "integrally involved in and responsible for the decisions" that led to worsening production oversight and the release of contaminated OTC medications into the public marketplace.  The verified complaint states that it was Weldon's "lack of leadership [that] resulted in the degradation of quality control at J&J."  Compl. ¶¶ 23, 25.

The complaint makes several additional specific allegations against Weldon.  First, Weldon "drastically cut" J&J's corporate compliance team in 2007.  Second, around the time of the recalls in 2010, Weldon stated that the problems at J&J were not "systemic."  Third, during his testimony before Congress on September 30, 2010, Weldon acknowledged that J&J had let the public down by not maintaining high production standards and accepted "full accountability for the problems at McNeil."  Compl. ¶¶ 73, 81, 171 (quotation marks and emphasis omitted).

D.  Costco's Sale of Children's Tylenol

At some point in 2010, plaintiff Katy Moore purchased a bottle of Very Berry Strawberry flavored Children's Tylenol from a Costco store in Union Gap, Washington.[6]  The medication

---

[6] The complaint does not specify when in 2010 Ms. Moore purchased the Children's Tylenol from the Union Gap Costco.  At

had been manufactured at McNEIL-PPC's Fort Washington facility. The complaint states that Costco "placed into the stream of commerce the defective and contaminated Children's Tylenol which killed River Moore." No other factual allegations specific to Costco appear in the complaint. Compl. ¶ 22, 174-75.

E.   <u>Injury to River Moore</u>

As of July 2010, the Moores were not aware of, and "would have no way of knowing" about, the manufacturing problems and poor quality control at the McNEIL-PPC Fort Washington production facility. Compl. ¶ 177.

On July 22, 2010, the Moores' two-year-old son, River, came down with a fever and, that night, awoke with a temperature of 101 degrees. Ms. Moore gave River a dose of the Children's Tylenol that she had earlier purchased at Costco, "unknowingly administer[ing] a defective and contaminated recalled dose of Children's Tylenol." Within 30 minutes of ingesting the Children's Tylenol, River began spitting up blood and, at some point, went into shock. Ms. Moore took River to Yakima Memorial Hospital for treatment. By the next day, July 23, River's liver had failed and he died. Compl. ¶¶ 178-84, 188, 237.

---

oral argument, plaintiffs' counsel stated that Ms. Moore purchased the medication near the time of her son's birthday, which counsel believed was in March or April. 4/5/12 Hr'g Tr. at 39-40. The Court will accept that representation.

The complaint alleges that River's liver failure and subsequent death were caused by his ingestion of defective and contaminated Children's Tylenol placed into the stream of commerce by, among others, McNEIL-PPC, which manufactured the drug, and Costco, which sold the drug to Ms. Moore.  The complaint states that J&J, McNEIL-PPC, Costco, and J&J executives Weldon and Crane, failed to properly test the medication for contamination prior to its distribution and sale. The complaint also alleges that these defendants failed to warn the plaintiffs about the danger and potential impurity of the Children's Tylenol that Ms. Moore purchased.  Compl. ¶¶ 184-85, 191, 193-94, 217.

II.  <u>Analysis</u>

The Court must determine whether removal of the Moores' underlying state court lawsuit was proper.  The Court first addresses whether McNEIL-PPC is a citizen of Pennsylvania precluded from removing a Pennsylvania state court action to this Court.  The Court concludes that McNEIL-PPC is a citizen of New Jersey only and was, therefore, permitted to join in removing this action to federal court.  Next, the Court considers whether the inclusion of Pennsylvania citizens Weldon and Crane as defendants bars removal of the present action.  The Court finds that Weldon and Crane have been fraudulently joined

and that their status as Pennsylvania citizens does not make removal improper.  The Court then addresses the plaintiffs' argument that this Court lacks jurisdiction based on complete diversity among the parties, as defendant Costco and the plaintiffs are all Washington citizens.  Because the Court determines that Costco has been fraudulently joined on all claims, this commonality of citizenship does not divest the Court of subject matter jurisdiction.  Last, the Court considers and rejects the plaintiffs' claim that Crane's consent was necessary to effectuate removal.  Joinder of Crane was fraudulent.  Consequently, the other defendants were permitted to remove this action without her consent.

    A.   Citizenship of McNEIL-PPC

A civil action originally brought in state court is removable to federal court on the basis of diversity of citizenship provided that no defendant is a citizen of the state in which the action is brought.  28 U.S.C. § 1441(b).  A corporation is considered to be a citizen of its state of incorporation and the state where it has its "principal place of business."  Id. § 1332(c).

There is no dispute that McNEIL-PPC is incorporated in the State of New Jersey.  The parties disagree only as to the location of its principal place of business.  The plaintiffs

argue that McNEIL-PPC's principal place of business is Fort Washington, Pennsylvania.  The defendants, on the other hand, argue that McNEIL-PPC's principal place of business is Skillman, New Jersey.  The Court finds that McNEIL-PPC's principal place of business is Skillman, New Jersey.

       1.   Hertz "Nerve Center" Test

       Until recently, the circuits employed a variety of tests and looked to a multiplicity of factors to determine a corporate party's principal place of business for jurisdictional purposes.  In Hertz Corp. v. Friend, the Supreme Court sought to end the disunity and establish a single, more easily administrable approach to the "principal place of business" test.  130 S. Ct. 1181 (2010).  In Hertz, the Supreme Court adopted the "nerve center" test, holding that a corporation's principal place of business is "the place where a corporation's officers direct, control, and coordinate the corporation's activities."  Id. at 1192.

       In doing so, the Supreme Court also clarified that the "principal place of business" referred to in § 1332(c) is a single location within a state and not the state with the greatest number of aggregate contacts to the corporation.  Id. at 1192-93.  Hertz counsels that this single locus of corporate coordination and direction should normally be the corporate

headquarters, but only where "the headquarters is the actual center of direction, control, and coordination."  Id. at 1192. The corporate nerve center is "not simply an office where the corporation holds its board meetings."  Id.  Nor can it be proven by "the mere filing of a form like the Securities and Exchange Commission's Form 10-K listing a corporation's 'principal executive offices.'"  Id. at 1195.

In Hertz, the Supreme Court acknowledged that the "nerve center" test may sometimes lead to counterintuitive results.  The Court provided the example of a hypothetical corporation where "the bulk of [its] business activities visible to the public take place in New Jersey, while its top officers direct those activities just across the river in New York."  Id. at 1194.  Despite the fact that the hypothetical corporation's public-facing activities were centered in New Jersey, the Supreme Court explained that such a corporation's principal place of business would be New York, where its corporate actions were coordinated and controlled.  Id.

Because Hertz states that "'principal place of business' refers to the place where *the corporation's high level officers* direct, control, and coordinate the corporation's activities," the threshold question in determining McNEIL-PPC's principal place of business is whether the "nerve center" test

permits this Court to consider activities of executives outside a party's corporate structure.  *Id.* at 1186 (emphasis added).

Hertz itself did not directly address that question. In *Hertz*, the uncontroverted facts demonstrated that petitioner Hertz Corporation's "leadership" was based at the company's headquarters in Park Ridge, New Jersey.  *Id.* (quotation marks omitted).  The Supreme Court was not called on to determine the composition of Hertz's "leadership" or resolve who, for citizenship purposes, may participate in a corporation's "nerve center," more generally.  For that reason, this Court does not read *Hertz* to set forth a hard-and-fast rule mandating that "nerve center" control must emanate from a company's own officers.

Indeed, the overall concern of *Hertz*'s corporate citizenship analysis is locating the "actual" center of corporate control and coordination.  *Id.* at 1192, 1195.  To limit the "nerve center" inquiry solely to the activities of the corporate officers listed on paper seems unduly restrictive for the same reason a court should not be required to reflexively accept as the corporate "nerve center" the "principal executive office" listed on a company's Form 10-K or a headquarters that is nothing more than an office where the corporation holds its board meetings.  *See id.* at 1192, 1195.  Doing so would potentially require courts to turn a blind eye to the "actual"

decisionmaking structure of a company in context and elevate form over substance in a manner that runs contrary to the pragmatic guidance in Hertz.

Since Hertz, neither the Court of Appeals for the Third Circuit, nor any other court of appeals has opined on whether a company's "nerve center" can exist outside the corporation.  Several pre-Hertz decisions bear on this issue, though.

In Mennen Co. v. Atlantic Mutual Insurance Co., the Third Circuit considered the principal place of business of Federal Insurance Co. ("Federal").  147 F.3d 287 (3d Cir. 1998). Federal had no employees of its own within the United States and all of its U.S.-based activities were performed by employees of a related corporation, some of whom were also officers of Federal.  Id. at 289 & n.3.  The Third Circuit concluded that Federal's principal place of business was in New Jersey, where most of the individuals coordinating and carrying out its U.S. business were located.  In doing so, the court reasoned that, "[i]n light of our stress on the pragmatic facts of corporate life as opposed to more formal lines of inquiry, we find it appropriate to consider the substantial quantity of Federal's activity carried out in New Jersey, notwithstanding that those who carry out Federal's business are not formally Federal employees."  Id. at 292.

Although decided using the "center of corporate activities" test for corporate citizenship, which considered a larger variety of factors than is now appropriate under the "nerve center" approach, Mennen is, nevertheless, instructive. See id. at 291.  Mennen counsels that a principal place of business analysis should focus on "the pragmatic facts of corporate life," such as the functions an individual actually performs for the business, and not corporate formalities, like the company payroll on which the individual is listed.  Id. at 292.  According to the Third Circuit's holding in Mennen, it is "proper" to attribute to one company substantial services that "operatives" of a different, but related, corporation perform on its behalf.  Id. at 293 n.7.

The "operatives" whose actions are relevant to determining McNEIL-PPC's corporate citizenship in the case at bar are somewhat different from those who were pertinent to Federal's citizenship in Mennen.  In Mennen, the Third Circuit considered the location of individuals who directed and performed Federal's everyday activities.  Id. at 291.  Here, the Court must decide McNEIL-PPC's citizenship based solely on the location of high-level managers who provide overarching direction, coordination, and control of the company.  This distinction does not, however, require a rejection of Mennen's central holding.  Mennen instructs that corporate citizenship is

based on the situs of individuals, even those outside of the
party corporation, who actually carry out the company's
activities.  Hertz's refocusing of the corporate citizenship
test to consider exclusively the actions of management, as
opposed to the actions of both senior and lower-ranking
functionaries, does not undercut that holding.

Prior to Hertz, the Fifth Circuit squarely addressed
whether a corporation's "nerve center" must be located within
the corporation.  In Toms v. Country Quality Meats, Inc.,
Brueggemeyer & Wolfe, Inc. ("B&W"), a Texas corporation, ran a
consortium of 60 meat-selling businesses, including Country
Quality Meats, Inc., a corporation that conducted business in
Georgia and was not a subsidiary of B&W.  610 F.2d 313, 314-15
(5th Cir. 1980); see also J.A. Olson Co. v. City of Winona, 818
F.2d 401, 410-11 & n.12 (5th Cir. 1987) (describing the
corporate structure of B&W and Country Quality Meats in Toms).

Applying the "total activity" test for corporate
citizenship, which it described as incorporating "both the
'places of activities' and the 'nerve center' tests," the Fifth
Circuit held that the principal place of business for Country
Quality Meats was in Texas, not Georgia.  Toms, 610 F.2d at 315.
The Fifth Circuit found that B&W exercised "operating control"
over Country Quality Meats, making "major business policy
decisions" and "essentially run[ning]" the Georgia business from

Texas.  Id. at 315-16.  The Fifth Circuit more explicitly expounded Toms' governing principle in J.A. Olson Co. v. City of Winona, stating that "a corporation's nerve center does not have to be located within the corporate shell, but can be found wherever the nerve center exists."  818 F.2d at 412.

At base, then, Mennen, Toms, and J.A. Olson display a pragmatic focus, also prevalent in Hertz, on identifying the actual location of corporate oversight and direction.  Although Hertz displaced the citizenship tests employed in Mennen, Toms, and J.A. Olson, this shared focus suggests that the functionalist principles guiding these earlier cases retain vitality.  Like the courts in those pre-Hertz cases, this Court concludes that the principal place of business inquiry may peer beyond a party's corporate form and look to the activities of individuals who actually control and direct the corporation from distinct, but related, corporate entities.


2.   McNEIL-PPC's "Nerve Center"

The defendants, as the parties asserting the existence of diversity jurisdiction, have the burden of establishing, by "competent proof," that McNEIL-PPC's "nerve center" is in Skillman, New Jersey.  Hertz, 130 S. Ct. at 1194 (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377

(1994); <u>McNutt v. Gen. Motors Acceptance Corp.</u>, 298 U.S. 178, 189 (1936)).

The defendants acknowledge that three of McNEIL-PPC's principal officers, President Denice Torres, Vice President/CFO Kirk Barton, and Secretary Shane Freedman work out of McNEIL-PPC's Fort Washington facility.  According to McNEIL-PPC's bylaws, Torres, as president of the company, also has "general charge and supervision" of the company's overall business. Pls.' 5/21/12 Supp. Br., Ex. C.  The defendants contend, however, that these official titles and powers do not reflect the reality of corporate control at McNEIL-PPC.  The defendants' position finds ample support in the record.

According to the unchallenged deposition testimony of McNEIL-PPC Assistant Secretary Raj R. Vaswani, Torres and Barton are only involved in overseeing the McNeil Consumer Healthcare Division, which produces such OTC medications as Children's Tylenol.  They do not manage the overall business of McNEIL-PPC, which also includes production, distribution, and marketing of several other consumer brands, such as Listerine, O.B., Stayfree, Carefree, Visine, Rogaine, and Rembrandt.  The bylaws may confer on Torres authority to supervise all of McNEIL-PPC's business activities, but the evidence before the Court shows that she does not make full use of her corporate powers.  <u>See, e.g.,</u> 5/8/12 Vaswani Dep. 52-53, 55-56, 59-60.

Instead, five other individuals direct, control, and coordinate McNEIL-PPC's activities owing to their executive positions in the FCC, the operating group of J&J's consumer businesses to which McNEIL-PPC belongs.  These individuals are: (1) Roberto Marques, company group chairman for the FCC in North America; (2) Greg Herlan, FCC head of finance in North America; (3) Roberto DiBernardini, FCC North American head of human resources; (4) Larry Montes, FCC vice president of healthcare compliance in North America; and (5) Caitlin Pappas, vice president of consumer sales for the FCC in North America.[7] Vaswani Supp. Decl. ¶¶ 6, 8-12; 5/2/12 Vaswani Dep. 103-06, 112-15.

Marques provides overarching executive direction and oversight as the North American head of the FCC.  He also serves on the GOC, the body providing high-level direction for J&J's

---

[7] The defendants also contend that Jesse Wu, worldwide chairman of the FCC, provides overarching direction to J&J consumer businesses, including McNEIL-PPC.  Vaswani Supp. Decl. ¶ 7.  The plaintiffs, however, have submitted deposition testimony of J&J in-house counsel Douglas Chia from an earlier litigation, in which Chia states that Colleen Goggins, Wu's predecessor as worldwide chairman of the consumer businesses, "ha[d] the power and authority to make commands," but that the consumer businesses under her did not have to follow those commands and, in practice, did not heed all of Goggins' directives.  Pls.' 4/4/12 Resp., Ex. D.  Because the evidence is conflicted as to whether the consumer businesses actually follow directives from the worldwide chairman, Wu's involvement in McNEIL-PPC's operations does not form part of the basis for this Court's decision with respect to McNEIL-PPC's "nerve center."

consumer sector, and the internal J&J directory states that he supervises McNEIL-PPC president, Denice Torres.  Marques is assisted by the four other senior managers mentioned above, each of whom is in charge of a distinct facet of the FCC's—and, by extension, McNEIL-PPC's—operations.  Significantly, in addition to Marques, three of these FCC senior executives are based in Skillman.[8]  Marques also holds regular meetings with the heads of the FCC's various operational functions in Skillman.  With the exception of Herlan, there is no evidence suggesting that any of these executives is located in Fort Washington.  Vaswani Supp. Decl. ¶¶ 8-12; 5/2/12 Vaswani Dep. 103-06, 112-15, 139-41; 5/8/12 Vaswani Dep. 75-77; Pls.' 5/21/12 Supp. Br., Ex. A.

The plaintiffs do not dispute that these individuals are the ones who functionally control McNEIL-PPC's business.  Rather, they attempt to cast doubt on the reliability of Assistant Secretary Vaswani's testimony by pointing to supposed discrepancies in his statements.  In Vaswani's supplemental declaration, he states that he is "fully familiar" with McNEIL-PPC's corporate structure, while, at deposition, he stated that he was "familiar" but perhaps not "fully familiar" with the company's structure.  Vaswani Supp. Decl. ¶ 2; 5/2/12 Vaswani Dep. 17.  Additionally, Vaswani's original declaration states

_____

[8] As noted above, there is conflicting evidence regarding the location of Herlan's office.  His office is located in either Skillman or Fort Washington.

that "McNEIL-PPC's headquarters in Skillman, New Jersey, is where substantial portions of direction, control, and coordination of all McNEIL-PPC business activities occur," but his supplemental declaration states that coordination and direction occurs in "New Jersey," more generally.  Vaswani Decl. ¶ 7; Vaswani Supp. Decl. ¶ 4.

The Court is not persuaded that either proffered discrepancy calls Vaswani's credibility into question.  The first, a minor equivocation, is hardly material.  The second is not even a discrepancy at all.  Whether or not the language in each of the Vaswani declarations is identical, both declarations provide evidentiary support for finding McNEIL-PPC's "nerve center" in Skillman, a single location within a state, as required by Hertz.  Hertz, 130 S. Ct. at 1192-93.  The Court, therefore, finds Vaswani's statements to be reliable.

The Court does not find availing any of the plaintiffs' other arguments asserting that McNEIL-PPC's principal place of business is located in Fort Washington.  The plaintiffs rely on a variety of documents to make their argument, such as (1) the press release for the April 30, 2010 recall issued out of Fort Washington; (2) a Children's Tylenol package label identifying Fort Washington as its place of production; and (3) business records on file with the States of New Jersey and Pennsylvania.  Pls.' 2/14/12 Br., Exs. E & F;

Pls.' 5/21/12 Supp. Br., Exs. D & E.  The press release and
Children's Tylenol packaging have little, if any, relevance to
the Court's "nerve center" inquiry, and do not even purport to
identify McNEIL-PPC's corporate headquarters.  As for the state
business records, they merely list the Fort Washington address
at which officers of McNEIL-PPC may be contacted.  With the
exception of McNEIL-PPC Treasurer Gregory Herlan, however, none
of the officers on the state business listings is part of the
executive team that, according to the evidence, directs and
controls McNEIL-PPC's business.  Their contact addresses are,
therefore, immaterial to the "nerve center" inquiry.

        Lastly, the plaintiffs mistakenly invoke the Third
Circuit's decision in <u>Quaker State Dyeing & Finishing Co. v. ITT
Terryphone Corp.</u>, to assert that the defendants improperly
attribute J&J's "nerve center" to McNEIL-PPC because J&J, as the
parent company, wields ultimate policy and managerial control.
<u>See</u> Pls.' 5/21/12 Supp. Br. at 16-17 (citing <u>Quaker State Dyeing
& Finishing Co.</u>, 461 F.2d 1140, 1142 (3d Cir. 1972); <u>Topp v.
CompAir Inc.</u>, 814 F.2d 830, 835 (1st Cir. 1987)).  The
plaintiffs misperceive the defendants' argument.  The defendants
do not argue that McNEIL-PPC shares J&J's "nerve center"; the
defendants contend that McNEIL-PPC's principal place of business

is Skillman and J&J's is New Brunswick.[9]  See Notice of Removal
¶¶ 7-8.

        The Court finds that the defendants have carried
their burden in establishing that McNEIL-PPC's principal place
of business is located in Skillman, New Jersey.  As a New Jersey
citizen, McNEIL-PPC was permitted to remove the underlying
Pennsylvania state court case to this Court.


        B.    Claims Against Weldon and Crane

        Although the verified complaint includes claims
against Pennsylvania citizens Weldon and Crane, the defendants
claim that these J&J executives were fraudulently joined and
their citizenship should be ignored for jurisdictional purposes.
The Court agrees with defendants and finds that, because Weldon

_____

        [9] The plaintiffs also cannot rely on prior district court
decisions in which McNEIL-PPC's principal place of business was
found to be Fort Washington to estop the defendants from arguing
otherwise in this case.  Pls.' 2/14/12 Br. at 10-12 (citing
Dunson v. McNeil-PPC, Inc., 346 F. Supp. 2d 735 (E.D. Pa. 2004);
Procter & Gamble Co. v. McNeil-PPC, Inc., 615 F. Supp. 2d 832
(W.D. Wis. 2009)).  As an initial matter, this Court is
obligated to make an independent inquiry into facts
determinative of its jurisdiction.  Mennen, 147 F.3d at 294.
Moreover, neither of these earlier cases examined McNEIL-PPC's
citizenship under the "nerve center" test that controls here.
In Procter & Gamble, McNEIL-PPC's citizenship was irrelevant and
undisputed because jurisdiction was based on a federal question,
and, in Dunson, a pre-Hertz case, the court declined to apply
the "nerve center" test.  Procter & Gamble, 615 F. Supp. 2d at
835, 841; Dunson, 346 F. Supp. 2d at 738-41.  In fact, the court
in Dunson noted that a "nerve center" inquiry suggested McNEIL-
PPC's principal place of business was in New Jersey.  Dunson,
346 F. Supp. 2d at 740-41.

and Crane were fraudulently joined in this action, their
Pennsylvania citizenship presents no bar to removal.


      1.   Fraudulent Joinder Standard

      Fraudulent joinder serves as an exception to the
typical requirements for removal of an action to federal court.
Under this doctrine, an action can be removed despite the
existence of forum-state or non-diverse defendants if those
parties were "fraudulently" named as defendants with the sole
purpose of defeating federal jurisdiction.  In re Briscoe, 448
F.3d at 216.  A finding of fraudulent joinder permits the
district court to disregard the citizenship of such non-diverse
or forum defendants, assume jurisdiction over the action,
dismiss any such fraudulently joined defendants, and retain
jurisdiction over the case.  Id.  Where joinder of a defendant
was not fraudulent, the court must remand the action to state
court for lack of jurisdiction.  Id. (citing 28 U.S.C. §
1447(c)).

      "[J]oinder is fraudulent if 'there is no reasonable
basis in fact or colorable ground supporting the claim against
the joined defendant, or no real intention in good faith to
prosecute the action against the defendant or seek a joint
judgment.'"  Id. (quoting Abels v. State Farm Fire & Cas. Co.,
770 F.2d 26, 32 (3d Cir. 1985)).  In a removed state court

action where a forum defendant asserts fraudulent joinder, "'if there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court.'"   Id. at 217 (quoting Batoff v. State Farm Ins. Co., 977 F.2d 848, 851 (3d Cir. 1992)).

The burden of persuasion on a defendant asserting fraudulent joinder is "heavy."   Batoff, 977 F.2d at 851 (quotation marks and citation omitted).   The district court conducting a fraudulent joinder analysis must consider the complaint at the time the notice of removal was filed, accepting the factual allegations of the complaint as true and "'resolv[ing] any uncertainties as to the current state of controlling substantive law in favor of the plaintiff.'"   Id. at 851-52 (quoting Boyer v. Snap-On Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990)).   Examination of a plaintiff's claims is less probing than on a motion to dismiss.   Indeed, a claim that survives fraudulent joinder scrutiny may ultimately be dismissed on a Rule 12(b)(6) motion.   Id. at 852.   A fraudulent joinder analysis requires the district court to ask only whether the plaintiff's claims are "'wholly insubstantial and frivolous.'"   Id. (quoting Lunderstadt v. Colafella, 885 F.2d 66, 70 (3d Cir. 1989)).

2.    Choice of Law

The plaintiffs' claims against Weldon and Crane are alleged under state law.  Typically, a federal court sitting in diversity must decide which state's laws to apply to the claims raised in the action.  Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941); Hammersmith v. TIG Ins. Co., 480 F.3d 220, 226 (3d Cir. 2007).

The Third Circuit has stated, however, that "[a] federal court cannot engage in a choice of law analysis where diversity jurisdiction is not first established," precluding a court from performing a choice of law analysis at the fraudulent joinder stage so long as the plaintiff's proffered choice of law is colorable.  Abels, 770 F.2d at 32-33 & n.10; see also Gibboni v. Hyatt Corp., No. 10-2629, 2011 WL 1045047, at *3 n.1 (E.D. Pa. Mar. 22, 2011); Ware v. CIBA Specialty Chems. Corp., No. 04-1645, 2004 WL 1743938, at *3 (D.N.J. Aug. 4, 2004).

The plaintiffs suggest that Pennsylvania law applies to their claims against Weldon and Crane.  See Pls.' 2/14/12 Br. at 13.  This choice of law appears colorable under the "interests/contacts" test employed by Pennsylvania courts, which this Court is also obligated to apply.  See Hammersmith, 480 F.3d at 226-231; LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996).  Weldon and Crane are Pennsylvania citizens and their alleged failure to monitor adequately plant conditions

-30-

at the Fort Washington, Pennsylvania facility that produced Children's Tylenol make up a substantial part of the plaintiffs' allegations against them.  Pennsylvania arguably has an interest in monitoring the activities of manufacturers within its borders and determining the scope of liability faced by its citizens. See LeJeune, 85 F.3d at 1071.  The Court will, therefore, analyze whether the plaintiffs' claims against Weldon and Crane are themselves colorable under Pennsylvania law.

### 3.   Analysis of Claims Against Weldon and Crane

Pennsylvania law recognizes that managers of a corporation may be held liable for torts committed by the corporation under the participation theory.[10]  Wicks v. Milzoco Builders, Inc., 470 A.2d 86, 90 (Pa. 1983).  The participation theory holds that a corporate officer may be held personally liable for his or her participation in tortious activity by the corporation, but only where the officer "specifically direct[s] the particular act to be done or participate[s], or cooperate[s] therein."  Id. (quotation marks and citation omitted); see also Shay v. Flight C Helicopter Servs., Inc., 822 A.2d 1, 17-20 (Pa. Super. Ct. 2003).  This theory makes actionable an executive's

---

[10] Pennsylvania courts also recognize executive tort liability under a traditional veil-piercing theory.  Wicks, 470 A.2d at 89-90.  The plaintiffs do not allege their claims against Weldon and Crane on that theory, which is premised on abuse of the corporate form.  Id.

misfeasance, but not nonfeasance.  Wicks, 470 A.2d at 90.
"[T]he mere averment that a corporate officer should have known
the consequences of the liability-creating corporate act
is . . . insufficient to impose liability."  Id.

          With respect to Weldon, the complaint alleges that he
"had personal knowledge of the deplorable conditions" at J&J's
facilities, including the one in Fort Washington, and that he
was "involved in and responsible for the decisions" that
ultimately led to allegedly defective pediatric medicines being
released on the market.  In particular, the plaintiffs cite
Weldon's decision to reduce the size of the corporate compliance
group in 2007 as a contributing factor to the degradation in
quality control at J&J facilities.  Compl. ¶¶ 23, 73, 76.

          At most, these assertions, taken as true, establish
that Weldon set corporate priorities that he "should have known"
would cause injury to members of the public.  Weldon is not
alleged to have "specifically directed the particular act"
involved in this lawsuit, i.e., the manufacture and distribution
of purportedly defective Children's Tylenol or any later
improper recall of that product.  Wicks, 470 A.2d at 90
(quotation marks and citation omitted).  Indeed, the plaintiffs
contend that it was Weldon's "*lack* of leadership" that led to
the defective production of Children's Tylenol that harmed River

Moore.  Compl. ¶ 23 (emphasis added).  These allegations do not rise to the level of actionable misfeasance.

The plaintiffs further allege that Weldon's statements at the September 30, 2010 congressional hearing establish his personal liability for harms resulting from McNEIL-PPC's production of Children's Tylenol.  The plaintiffs argue that Weldon negligently downplayed the dangers posed by recalled McNEIL-PPC products then in the public domain when he stated that any such drugs already purchased by consumers posed "no risk, no safety hazard."  Id. ¶ 173 (emphasis omitted).  Because this statement was made two months after the death of River Moore, the Court fails to see how it could have contributed in any way to River's injury.[11]

The plaintiffs also note that, at the September hearing, Weldon stated that he accepted "full accountability for the problems at McNeil."  Id. ¶ 171.  This statement, akin to the "buck stops here," does not sufficiently demonstrate that

---

[11] Weldon's other statements attempting to "downplay" the manufacturing problems that precipitated McNEIL-PPC's recalls also do not provide a basis for tort liability.  See Compl. ¶ 81.  The complaint alleges that these statements were made "at the time of the 2010 recalls," which occurred at various points throughout that entire year.  Id. ¶¶ 81, 118-43.  This inexact allegation cannot establish that Ms. Moore relied on Weldon's statements to form a mistaken impression that Children's Tylenol was safe when she purchased it, also at some point "[i]n 2010."  See id. ¶¶ 81, 174, 177.

Weldon directly participated in any negligent activity at McNEIL-PPC's Fort Washington facility.

The plaintiffs similarly fail to make out a colorable claim against Crane, for whom the allegations are even sparser. The factual assertions in the complaint involving Crane are limited to the bare assertion that she had "personal knowledge of the deplorable conditions" at the Fort Washington plant and that she was "integrally involved in and responsible for the decisions that led to the degradation of quality control." Id. ¶ 25. As with Weldon, even if Crane's decisions led to the eventual production of defective Children's Tylenol, the complaint does not allege that Crane "deliberately ordered" the defective production or distribution of that OTC medication. Wicks, 470 A.2d at 90. The complaint does not even state what Crane's "decisions" were that "led to the degradation of quality control." This is not enough to establish Crane's personal involvement in McNEIL-PPC's production of purportedly defective Children's Tylenol.

Despite the apparent inadequacy of their allegations, the plaintiffs rely on Humane Society v. Metso Paper USA, Inc. as a tort case in which similar assertions against an executive defendant withstood fraudulent joinder scrutiny. Pls.' 2/14/12 Br. at 16-17 (citing Humane Society v. Metso Paper USA, Inc., Nos. 06-8, 06-9, 06-19, 2006 WL 860110 (M.D. Pa. Mar. 31,

2006)).  Contrary to the plaintiffs' characterization of that case, Humane Society is distinguishable.  In Humane Society, the defendant plant manager, unlike Weldon and Crane, bore direct responsibility for overseeing the negligent activities of the corporate facility in question.  2006 WL 860110, at *1. Additionally, the defendant in Humane Society independently hid evidence of the corporation's negligence from regulatory agencies and "provided false and misleading information" regarding the company's actions.  Id. (quotation marks omitted). To the extent any of Weldon's statements arise to the same level of concealment and misrepresentation, as noted above, they were made after River Moore's death and could not have contributed to River's injury.

        The plaintiffs have not pled a colorable claim against Weldon and Crane under Pennsylvania law, and, as a result, those two defendants have been fraudulently joined.  Their Pennsylvania citizenship does not render removal to this Court improper.


    C.    Claims Against Costco

        The plaintiffs bring the following twelve claims against Costco, whose Union Gap, Washington location carried and sold the Children's Tylenol ingested by River Moore: Count I (Strict Liability under Restatement (Second) of Torts § 402A);

-35-

Count II (Strict Liability under Restatement (Second) of Torts § 402B); Count III (Recklessness); Count IV (Negligence); Count V (Breach of Express Warranty); Count VI (Breach of Implied Warranty of Merchantability); Count VII (Negligent Infliction of Emotional Distress); Count VIII (Violation of Consumer Protection Law); Count IX (Civil Conspiracy & Aiding and Abetting); and Count X (Punitive Damages).  Daniel Moore, River's father, also brings wrongful death and survival causes of action as administrator of River's estate.

Costco is a citizen of Washington, the state of the plaintiffs' citizenship, and its inclusion as a party would normally divest this Court of subject matter jurisdiction.  The Court finds that Costco is fraudulently joined with respect to all claims alleged in the complaint, however.  Disregarding Costco's citizenship, as is appropriate upon a finding of fraudulent joinder, complete diversity among the parties exists and this Court has subject matter jurisdiction over the present action.  See In re Briscoe, 448 F.3d at 216.


1.   Applicable Law

As explained in Section II.B.2, supra, a district court assessing the viability of state law claims at the fraudulent joinder stage should not engage in a choice of law analysis and should instead apply the body of law suggested by

the plaintiff, so long as that choice of law is itself colorable.  Here, however, the plaintiffs in their complaint and briefing suggest no choice of law to apply to their claims against Costco.

Indeed, at oral argument, plaintiffs' counsel for the first time argued that Pennsylvania law applies to the plaintiffs' causes of action against Costco.  Plaintiffs' counsel went on to state that it was unnecessary to conduct a choice of law analysis at this point, though, arguing that the Court should assess the colorability of the plaintiffs' claims against Costco under the laws of both Pennsylvania (the situs of McNEIL-PPC's production and distribution of Children's Tylenol) and Washington (the state where Costco sold Children's Tylenol to Ms. Moore and where she administered it to her son).  See, e.g., 4/5/12 Hr'g Tr. at 31-32, 46-47, 62-63.  For their part, the defendants argue that Washington law applies to these claims.  Def'ts' 3/2/12 Opp. Br. at 9-15.

The Court declines to take the approach offered by the plaintiffs, as no colorable argument can be made for the application of Pennsylvania law to the counts pled against Costco.  These claims are brought by Washington consumers against a Washington retailer arising out of a Washington-based sale of OTC medication that was also ingested and allegedly resulted in injury to the plaintiffs while in the State of

Washington.  Under Pennsylvania's choice of law framework, these factors all weigh in favor of applying Washington, not Pennsylvania, law.  LeJeune, 85 F.3d at 1071 (a jurisdiction has an interest in having its laws applied to controversies involving its citizens); Shields v. Consol. Rail Corp., 810 F.2d 397, 401 (3d Cir. 1987) (where the place of injury is non-fortuitous, that jurisdiction has a significant interest in having its law applied).  The fact that the Children's Tylenol at issue was produced in Pennsylvania would be relevant to the choice of law governing the plaintiffs' claims against the manufacturers, J&J and McNEIL-PPC, but it is not relevant to the plaintiffs' claims against the retailer, Costco.  Accordingly, the Court will analyze the claims against Costco under Washington law.

The Washington Product Liability Act ("WPLA") provides a single cause of action for harms resulting from the manufacture, sale, or use of products.  Wash. Water Power Co. v. Graybar Elec. Co., 774 P.2d 1199, 1204 (Wash. 1989).  The WPLA displaces common law product liability causes of action, and its preemptive scope is extensive.  Bingham v. Blair LLC, No. 10-5005, 2010 WL 1608881, at *2 (W.D. Wash. Apr. 19, 2010) ("The WPLA is preemptive and the scope of WPLA is broadly defined so as to include any claim or action brought for harm caused by the product.  The purpose of the statute is to eliminate common law

remedies and provide a single cause of action." (citations omitted)).  It covers:

> any claim or action previously based on: Strict liability in tort; negligence; breach of express or implied warranty; breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation, concealment, or nondisclosure, whether negligent or innocent; or other claim or action previously based on any other substantive legal theory except fraud, intentionally caused harm or a claim or action under the consumer protection act.

Wash. Rev. Code § 7.72.010(4).

The WPLA also explicitly limits the product liability claims available against a product seller who does not also manufacture its products.  A non-manufacturing retailer, such as Costco, may only be sued for (i) negligence, (ii) breach of express warranty, or (iii) intentional misrepresentation.  Id. § 7.72.040(1).

    2.   Strict Liability and Breach of Implied Warranty Claims

The complaint includes two strict liability counts against Costco, as well as a cause of action for breaching the implied warranty of merchantability.  The WPLA plainly precludes such claims and Costco is fraudulently joined on these counts.[12]

_____

[12] Although the WPLA itself does not permit recovery for product liability claims premised on the breach of an implied warranty, other provisions of the Washington Code enable a

3.   Breach of Express Warranty Claim

The plaintiffs also contend that Costco breached express warranties in its sale of Children's Tylenol.  The WPLA recognizes breach of express warranty as one of the three product liability claims cognizable against a non-manufacturing retailer.  There is, therefore, no threshold bar to this claim.

Washington law provides that an express warranty must be "part of the basis of the bargain" between the parties. Wash. Rev. Code § 62A.2-313(1); see also Carideo v. Dell, Inc., 706 F. Supp. 2d 1122, 1131 (W.D. Wash. 2010).  Express warranties by a seller are created by (a) an affirmation of fact or promise relating to the goods; (b) a description of the goods; or (c) the provision of a sample or model.  Wash. Rev. Code § 62A.2-313(1).

The plaintiffs fail to make any factual allegations that would support their breach of express warranty claim. Beyond a general allegation that "Defendants made express warranties as to [Children's Tylenol's] safety and efficacy, without making clear and/or warning of the extreme danger

---

plaintiff to recover for "direct or consequential economic loss" due to a product seller's breach of the implied warranty of merchantability.  Wash. Rev. Code §§ 7.72.010(6), 62A.2-314. Here, the plaintiffs do not argue that Costco's alleged breach of the implied warranty of merchantability resulted in economic injury, instead premising their suit on personal injuries.  As a result, their implied warranty claim does not entitle them to relief under the WPLA or any other Washington statute.

associated with the use of defective, impure and contaminated drugs," the plaintiffs do not allege any specific statement or action taken by Costco that became "part of the basis of the bargain" for the medication.[13]  Compl. ¶ 221.  The only specific "express warranties" to which the complaint refers are statements made by defendants other than Costco.  See id. ¶¶ 53-62, 168, 173, 222.

The plaintiffs' breach of express warranty claim against Costco is based on nothing more than Costco's alleged failure to warn consumers about the purported dangers of Children's Tylenol.  As such, this breach of express warranty claim is "wholly insubstantial and frivolous" and joinder of Costco as a defendant on that claim is fraudulent.  Batoff, 977 F.2d at 852 (quotation marks and citation omitted).


4.   Negligence Claim

As noted, the WPLA permits product liability actions against retailers based on a claim of negligence.  The negligence count in the verified complaint recites several allegations against defendants, including Costco.  See Compl.

---

[13] The plaintiffs appear to concede in their briefing that they have not yet identified any express warranty on the part of Costco.  They argue that remand would be improper because, "[a]t a minimum, [they] are permitted discovery on whether Costco expressly warranted the safety of the over-the-counter medicines it sold."  See Pls.' 3/7/12 Reply Br. at 5 (emphasis added).

¶ 217.  These assertions boil down to claims that Costco, among other defendants, was negligent in its failure to (i) ensure that the Children's Tylenol it sold was not defective, impure, or contaminated, through inspection or otherwise, and (ii) warn consumers of the dangers posed by Children's Tylenol.[14]

Washington law requires a plaintiff alleging negligence against a product seller to prove the following elements: (a) an offer of sale by the retailer; (b) a duty of care in the retailer; (c) a failure by act or omission to perform the retailer's duty; (d) an injury occurring from use of the product; and (e) a failure to perform the retailer's duty proximately caused the injury.  Martin v. Schoonover, 533 P.2d

---

[14] The complaint does not specifically allege that Costco failed to warn about defects in Children's Tylenol after Ms. Moore purchased the medication, including after it was recalled. Even if the Court were to construe the plaintiffs' failure-to-warn claim to include an allegation that Costco neglected to warn of product defects post sale, the plaintiffs have offered no support for holding Costco liable on the basis of that allegation.  At oral argument, counsel for certain defendants correctly noted that the WPLA does impose a post-sale duty to warn, but that it does so in a section "devoted only to manufacturers."  4/5/12 Hr'g Tr. at 59-60 (citing Wash. Rev. Code § 7.72.030(1)(c)); see also Esparza v. Skyreach Equip., Inc., 15 P.3d 188, 198-99 (Wash. Ct. App. 2000) (finding that manufacturers have a post-sale duty to warn under Wash. Rev. Code § 7.72.030(1)(c)).  The plaintiffs have not cited to any Washington statute or case that similarly imposes negligence liability on non-manufacturing retailers for failing to warn consumers about product dangers after the point of sale.

Other allegations listed under the complaint's negligence count, such as a "fail[ure] to conduct a recall in a timely manner," relate solely to the defendants involved in the manufacture of Children's Tylenol.  See Compl. ¶ 217.

438, 442 (Wash. Ct. App. 1975).  There is a colorable basis for finding that factors (a), (d), and (e) have been met here.  The only questions are whether, under the facts as alleged in the complaint, Costco had a duty to inspect, remove, or warn about Children's Tylenol in its stores and whether it breached any such duty.

Under Washington law, "a seller does not have a duty to inspect or test a product for possible defects unless he has reason to know the product is likely to be dangerously defective."  Id.  Similarly, a retailer can only be held liable on a negligent failure-to-warn theory where the retailer knows or has reason to know that the product it sells is dangerous for its intended use.  Zamora v. Mobil Corp., 704 P.2d 584, 588 (Wash. 1985).  On either theory of liability, the plaintiffs in this case must demonstrate that Costco knew or had reason to know that the Children's Tylenol on its shelves in 2010 posed a danger to consumers.

a.   Allegations of Costco's Knowledge

The only allegation in the verified complaint that Costco knew or had reason to know of problems with its stock of Children's Tylenol is contained in an allegation against all defendants.  Paragraph 209 of the complaint states that, "[p]rior to July 22, 2010, the Defendants knew or willfully

-43-

and/or recklessly disregarded the dangers posed to the pediatric population by the defective, impure and contaminated Children's Tylenol manufactured at the Fort Washington plant."[15]  The only other allegations in the complaint that could be read to even impliedly state that Costco had actual or constructive knowledge of defects in Children's Tylenol are summary assertions that the defendants, including Costco, "[f]ail[ed] to exercise reasonable care" at various points in the manufacture, distribution, and sale of Children's Tylenol.  See, e.g., Compl. ¶ 217(d), (e), (g), (h).

These allegations do not create a "reasonable basis in fact" to find that Costco knew or had reason to know about any purported problems with Children's Tylenol.  See In re Briscoe, 448 F.3d at 217 (quotation marks and citation omitted).  Other courts reviewing product liability claims for fraudulent joinder have held that bald or conclusory allegations that a defendant "knew" of a product defect or "failed to use reasonable care" in the distribution or sale of a product do not establish colorable claims of negligence.  See, e.g., Block v. Toyota Motor Corp., 665 F.3d 944, 950 (8th Cir. 2011) (general and "conclusory allegations" that defendants knew of product defect did not

---

[15] This allegation is contained in the description of "Count III – Recklessness," not the description of "Count IV – Negligence."

offer "reasonable basis in fact and law" to hold product seller liable); In re Avandia Mktg., Sales Practices and Prods. Liab. Litig., 624 F. Supp. 2d 396, 424 (E.D. Pa. 2009) (allegation of "fail[ure] to use reasonable care in . . . distributing, marketing and selling" prescription drug insufficient to establish colorable negligence claim (quotation marks omitted));[16] cf. Reeser v. NGK Metals Corp., 247 F. Supp. 2d 626, 630-31 (E.D. Pa 2003) (finding "conclusory allegations" of civil conspiracy and fraud "clearly insufficient" under fraudulent joinder analysis).

The Eighth Circuit's decision in Block is particularly instructive.[17]  The plaintiff in Block brought strict product liability and negligence claims against several entities involved in the manufacture, distribution, and sale of an allegedly defective Toyota Camry, including Brooklyn Park Motors, the car dealership that sold the automobile.  665 F.3d

---

[16] The theory of liability in In re Avandia was based on breach of a pharmacist's duty of care under New York law, which is different than the duty to inspect or warn that Washington law imposes on a retailer.  See In re Avandia, 624 F. Supp. 2d at 424.  Nevertheless, the Avandia court's conclusion—that rote recital of a defendant's "fail[ure] to use reasonable care" cannot establish a colorable claim of negligence—applies with equal force to any breach-of-duty claim.

[17] The Eighth Circuit in Block applied a fraudulent joinder standard similar to that used in this Circuit: whether there is "arguably a reasonable basis for predicting that the state law might impose liability based upon the facts involved."  665 F.3d at 948 (quotation marks and citation omitted).

at 946-47.  To succeed on her claims, the plaintiff needed to demonstrate that Brooklyn Park Motors, a non-manufacturing retailer, knew or should have known of the alleged product defect.  Id. at 948, 951.  The complaint stated only that "the Defendants" knew or should have known of manufacturing problems with Toyota Camrys.  Id. at 950.

The Eighth Circuit found Brooklyn Park Motors to be fraudulently joined on both the strict liability and negligence claims, as the complaint offered "no reasonable basis in fact and law" to support the proposition that it had actual or constructive knowledge of the defect.  Id.  The court found that "conclusory allegations" as to what "the Defendants" knew or should have known were insufficient to show that Brooklyn Park Motors, in particular, had any awareness of the alleged Toyota Camry defects.  Id. at 950-51.

Here, as in Block, the plaintiffs' summary assertions that "the Defendants" were aware of contamination or impurity in Children's Tylenol and that they failed to exercise reasonable care in manufacturing and selling that product do not sufficiently plead, let alone colorably establish, that Costco knew or should have known of the dangers posed by the medication.

            b.   Other Evidence of Costco's Knowledge

          Even where a plaintiff fails to plead sufficiently

that a product seller defendant knew or should have known of an

alleged product defect, courts reviewing a negligence claim for

fraudulent joinder will look to the other assertions in the

complaint to see if they support that missing allegation.  See

Block, 665 F.3d at 950; cf. King v. Centerpulse Orthopedics,

Inc., No. 05-1318, 2006 WL 456478, at *4 (N.D. Ohio Feb. 24,

2006); Zehner v. Nordskog Indus., Inc., No. 92-2508, 1992 WL

233984, at *3 (E.D. La. Sept. 2, 1992).[18]

          Here, any notice to Costco of defects in Children's

Tylenol would have to be based on the verified complaint's

allegations regarding production problems at McNEIL-PPC.  The

complaint alleges that McNEIL-PPC had a history of poor quality

control, dating back to at least 2002; the FDA wrote reports

_____

          [18] In King and Zehner, both cited by the defendants, the
courts actually reviewed evidence beyond the pleadings when
considering whether a non-manufacturing retailer had been
fraudulently joined.  See King, 2006 WL 456478, at *4 & n.4;
Zehner, 1992 WL 233984, at *3.  Given the Third Circuit's
admonition that fraudulent joinder analysis should "focus on the
plaintiff's complaint at the time the petition for removal was
filed," citation to these opinions is not meant to suggest that
this Court may look to all forms of collateral evidence in
determining the colorability of the plaintiffs' negligence claim
in the present case.  Batoff, 977 F.2d at 851-52 (quotation
marks and citation omitted).  The Court can and will, however,
consider additional factual assertions in the complaint to see
if there is support for the necessary, but missing, portion of
the plaintiffs' negligence claim regarding Costco's knowledge of
defects in Children's Tylenol.

                              -47-

criticizing McNEIL-PPC's quality control; and McNEIL-PPC issued several recalls between July 2009 and July 2010.  Compl. ¶¶ 63-98, 104-09, 113-23, 126-29.

Significantly, the verified complaint does not specifically allege or otherwise demonstrate that Costco had superior or advanced knowledge of problems with McNEIL-PPC's production of Children's Tylenol or other drugs.  A fair reading of the complaint leads to the conclusion that Costco had the same information regarding potential defects in McNEIL-PPC's products as the general public.

This is problematic for the plaintiffs' claim that Costco had a duty to inspect or warn about Children's Tylenol. Although the complaint discusses various quality control inadequacies at McNEIL-PPC facilities, including the one in Fort Washington that produced Children's Tylenol, the complaint does not explain how Costco or other members of the public would have gained access to this information.  Nor is it clear from the complaint that the FDA reports issued in 2004, 2008, and 2009 describing problems with McNEIL-PPC's production oversight were made available to Costco through publication or other means.

Even assuming the FDA's reports were public, the complaint does not describe them in sufficient detail to conclude that the reports should have placed Costco on notice of defects in Children's Tylenol.  With respect to the 2004 report,

the complaint does not state whether the poor sampling practices and recordkeeping problems it details were observed at McNEIL-PPC's Fort Washington plant.  See id. ¶ 67.  Critically, the complaint also fails to say whether the 2004 report concluded that the deficient practices cited therein rendered McNEIL-PPC's products unsafe to consumers.  The same is true of the complaint's description of the 2008 and 2009 reports, which addressed inadequate investigatory procedures at the Fort Washington plant.  See id. ¶¶ 78-79.  The complaint does not state whether the reports found these procedural problems to compromise the quality of McNEIL-PPC's products.  Moreover, the aforementioned reports were issued between 6 years and 1 year before Costco sold Ms. Moore the Children's Tylenol that she eventually gave to her son.  Three isolated reports of manufacturing quality control infractions over the preceding 6 years could not have notified Costco that the Children's Tylenol it held for sale in 2010 was dangerous.

        The product recalls cited in the complaint, which the plaintiffs allege were public, also do not support the plaintiffs' contention that Costco should have been aware of dangers posed by Children's Tylenol.  These recalls either did not involve Children's Tylenol or the facility at which it was manufactured, or were conducted in a manner that masked supposed product defects.  A 2009-2010 recall of pills exuding a "musty"

-49-

smell involved medication manufactured at McNEIL-PPC's Las
Piedrad, Puerto Rico facility, not the Fort Washington,
Pennsylvania facility that produces Children's Tylenol.  Id.
¶¶ 111-19, 126-29.  Another McNEIL-PPC recall issued on July 9,
2009 pertained only to Motrin IB and was initially conducted on
a "phantom" or "stealth" basis so as not to alert the general
public that the product was being removed from the shelves.  Id.
¶¶ 85-98.  A second 2009 recall, which did cover Children's
Tylenol, involved "only a few lots of Children's and Infant's
Tylenol."  Id. ¶¶ 105, 109.  According to the complaint, public
pronouncements by J&J and McNEIL-PPC at the time of the recall
also "hid[] the known hazards" associated with the recalled
products.  Id. ¶ 110.

          Other allegations in the verified complaint
affirmatively undercut the contention that Costco had reason to
know of defects in Children's Tylenol prior to the April 30,
2010 recall.  The complaint alleges that available information
regarding Children's Tylenol did not make the product's dangers
publicly known.  It states that "Manufacturing and Distributing
Defendants . . . failed to completely, adequately, and/or
accurately report the defects, impurities and contamination
contained in Children's Tylenol to the Food & Drug
Administration, the medical community, healthcare providers,
and/or consumers, including the Plaintiffs Daniel and Katy

Moore"[19] and that "[t]he warnings and instructions that accompanied Children's Tylenol provided inadequate warnings to certain groups, including but not limited to the medical community, healthcare provides, and/or consumers."  Id. ¶¶ 192, 201.  The complaint further asserts that "Plaintiffs Katy and Daniel Moore did not know, and would have no way of knowing, about Defendants J&J and McNeil's manufacturing deficiencies, product contamination and quality control issues at their Fort Washington, Pennsylvania facility."  Id. ¶ 177.

There is nothing in the complaint to suggest that Costco knew or should have known information regarding potential problems with Children's Tylenol that was not disseminated to the FDA, the medical community, or consumers.  According to the plaintiffs' own allegations, the information available to those constituencies was insufficient to alert them to any potential product defects.  It similarly could not have triggered Costco's duty to inspect or warn.  See In re Phenylpropanolamine (PPA) Prods. Liab. Litig., No. MDL 1407, 2002 WL 34418423, at *3 (W.D. Wash. Nov. 27, 2002) (interpreting similar negligence standard

---

[19] The complaint includes Costco in the category "Manufacturing and Distributing Defendants."  Id. ¶ 182.  The substance of this allegation could not plausibly be leveled at Costco, though, given that there is nothing in the complaint to suggest that Costco had any advanced or superior knowledge of the "defects, impurities and contamination contained in Children's Tylenol" to be able to report them to the FDA or other constituencies.

under Mississippi law and finding that manufacturers'
concealment of product defect could not result in product
seller's liability for negligent inspection or failure to warn).

Finally, it is noteworthy that the complaint is devoid
of allegations that Costco in any way altered the Children's
Tylenol it carried.  A general principle of retailer liability
under Washington law is that "[t]he more the retailer is only a
conduit for the product, the less likely he can be held in
negligence."  Martin, 533 P.2d at 442.  The plaintiffs here do
not assert that Costco, a bulk supply retailer, was anything but
a pure conduit for the OTC medications that it carried.

On the basis of the foregoing allegations, there is no
colorable ground supporting the negligence claim against Costco.
Abels, 770 F.2d at 32.  The fact that Costco sold the Children's
Tylenol that allegedly harmed River Moore, standing alone, does
not provide the necessary foundation for a negligence cause of
action.[20]

### 5.  Negligent Infliction of Emotional Distress Claim

Plaintiff Katy Moore separately brings a claim for
negligent infliction of emotional distress ("NIED") against

---

[20] This conclusion also disposes of the plaintiffs'
recklessness, wrongful death, and survival claims against
Costco, which similarly require a demonstration of wrongdoing
that the complaint fails to make out.

Costco.  Her claim is premised on the injury she witnessed her son suffer.

Washington law recognizes a claim of indirect NIED, permitting an individual to sue for "foreseeable intangible injuries caused by viewing a physically injured loved one shortly after a traumatic accident." Colbert v. Moomba Sports, Inc., 176 P.3d 497, 500 (Wash. 2008) (quotation marks and citations omitted).  There is some question as to whether such a cause of action may be maintained by a plaintiff suing a retailer under the WPLA, however, given the Act's extensive preemptive reach and the fact that it does not specifically mention the availability of NIED claims against product sellers. See Bylsma v. Burger King Corp., 676 F.3d 779, 781 (9th Cir. 2012).

The Court need not opine on this issue.  As the name of the tort suggests, an individual alleging NIED must demonstrate that the defendant breached some sort of duty to the plaintiff.  Snyder v. Med. Serv. Corp. of E. Wash., 35 P.3d 1158, 1164 (Wash. 2001).  Because the complaint does not present a colorable claim of negligence against Costco, Ms. Moore's separate claim for NIED, which is premised on Costco's negligence, also must fail.

6.   Consumer Protection Act Claim

The plaintiffs claim that Costco violated consumer protection laws by making "false and/or misleading representations, misrepresentations, and/or omissions of material facts" regarding the safety of Children's Tylenol. Compl. ¶ 253.

The WPLA excepts from its preemptive scope claims brought under the Washington Consumer Protection Act ("WCPA"). Wash. Rev. Code § 7.72.010.  To state a prima facie claim under the WCPA, a plaintiff must establish the following five elements: (a) an unfair or deceptive act or practice; (b) occurring in trade or commerce; (c) impacting the public interest; (d) an injury to the plaintiff's business or property; and (e) a causal link between the unfair or deceptive act or practice and the plaintiff's injury.  Ambach v. French, 216 P.3d 405, 407 (Wash. 2009).

Washington courts have held that the WCPA's focus on injury to "business or property" restricts the class of injuries for which recovery is available under the Act.  See, e.g., Stevens v. Hyde Athletic Indus., Inc., 773 P.2d 871, 872-73 (Wash. Ct. App. 1989).  Plaintiffs cannot recover under the WCPA for personal injuries or damages stemming from those personal injuries.  Ambach, 216 P.3d at 406, 408-09 (holding that medical expenses incurred as a result of a personal injury are not

compensable "business or property" injuries contemplated by the WCPA); Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 858 P.2d 1054, 1064 (Wash. 1993) (rejecting recovery for pain and suffering under the WCPA); see also Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc., 241 F.3d 696, 705 (9th Cir. 2001) ("Expenses for personal injuries are not injuries to business or property under the [Washington] CPA.").

Here, the plaintiffs' WCPA claim is based on personal injury to River Moore and his parents, not damage to business or property.  This claim is not colorable and cannot withstand fraudulent joinder scrutiny.

### 7.   Civil Conspiracy Claim

Also before the Court is a civil conspiracy claim against Costco.  Under Washington law, civil conspiracy has two required elements: (a) "two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means;" and (b) an agreement to accomplish the aim of the conspiracy.  Wilson v. State, 929 P.2d 448, 459 (Wash. 1996).  "Mere suspicion or commonality of interests is insufficient to prove a conspiracy."  Id.

The plaintiffs allege that Costco acted in concert with others to "violate state law and to defraud Plaintiffs causing Plaintiffs to purchase the defective, impure and

contaminated Children's Tylenol" and to "suppress[] and conceal[] . . . material information from the Plaintiffs about such products, including their potentially harmful effects as a result of undisclosed manufacturing defects and deficiencies." Compl. ¶¶ 258, 267.

Even at this preliminary stage of inquiry where the Court must generously review the plaintiffs' complaint, these allegations do not make out a colorable claim of civil conspiracy against Costco.  The complaint does not allege any facts that would establish an agreement between Costco and other individuals or entities to work in concert, let alone an agreement to act in a manner contrary to the law.  See Gossen v. JPMorgan Chase Bank, 819 F. Supp. 2d 1162, 1171 (W.D. Wash. 2011).  The complaint fraudulently joins Costco on this count.[21]

D.   Crane's Consent to Removal

The final issue that the Court must address is the plaintiffs' contention that removal was improper because defendant Rosemary Crane was served with the complaint at the time of removal but did not consent to removing the case.  In general, a state court case can only be removed to federal court

_____

[21] As none of the plaintiffs' claims against Costco is colorable, the Court does not separately analyze the availability of punitive damages on any of those claims.

if all defendants join in or consent to removal, the so-called "unanimity rule." <u>Lewis v. Rego Co.</u>, 757 F.2d 66, 68 (3d Cir. 1985).  Because Crane was fraudulently joined, however, her consent was unnecessary to make the case removable, and the defendants' failure to procure her consent does nothing to render removal improper.  <u>Balazik v. Cnty. of Dauphin</u>, 44 F.3d 209, 213 n.4 (3d Cir. 1995); <u>Ortiz v. Del. River Port Auth.</u>, No. 09-06062, 2010 WL 1633388, at *2 (E.D. Pa. Apr. 22, 2010).  The Court does not reach the defendants' alternative claim that Crane was not in fact properly served at the time of removal.

III. <u>Conclusion</u>

For the foregoing reasons, the Court will deny the plaintiffs' motion to remand this action to the Pennsylvania Court of Common Pleas.  An appropriate order shall issue separately.