IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


DANIEL MOORE, et al.          :          CIVIL ACTION
                              :
              v.              :
                              :
JOHNSON & JOHNSON, et al.     :          NO. 12-490


<u>MEMORANDUM</u>

McLaughlin, J.                          September 18, 2013

            This personal injury and wrongful death action arises
out of injuries allegedly suffered by the plaintiffs' son after
he ingested a dose of the over-the-counter medication, Children's
Tylenol.  The Children's Tylenol was produced by defendant
McNEIL-PPC, Inc. ("McNEIL-PPC") at its Fort Washington,
Pennsylvania production facility.  The plaintiffs allege that
their son's injuries and eventual death are directly attributable
to quality control problems and defective production at the Fort
Washington plant.

            The plaintiffs initially filed suit in the Pennsylvania
Court of Common Pleas, and the defendants removed the action to
this court.  On November 1, 2012, the Court denied the
plaintiffs' motion to remand the action back to Pennsylvania
court.  Presently before the Court is the plaintiffs' motion for
reconsideration of that decision or, in the alternative, to
certify the earlier decision for interlocutory appeal.

            After considering the factual and legal basis for its
prior decision, and in view of additional evidence and legal

argumentation presented by the parties, the Court reaches the same conclusion.  It will deny the plaintiffs' motion for reconsideration or for interlocutory appeal.

I.   Procedural Background

On December 29, 2011, the plaintiffs, Daniel and Katy Moore, filed suit in the Pennsylvania Court of Common Pleas against seventeen defendants, asserting twelve separate claims all stemming from the death of their son, River.  Among those named as defendants in the Moores' lawsuit are McNEIL-PPC; McNEIL-PPC's ultimate parent corporation, Johnson & Johnson ("J&J"); and J&J executive William C. Weldon.

Several of the defendants, including J&J, McNEIL-PPC, and Weldon, jointly filed a notice of removal to this Court on January 30, 2012, to which other defendants consented.  On February 14, 2012, the plaintiffs moved to remand the case to the Court of Common Pleas.  Among other things, the plaintiffs argued that McNEIL-PPC and Weldon are citizens of Pennsylvania and, as such, are barred by the "forum defendant" rule from removing a suit in the Pennsylvania Court of Common Pleas to a federal court within Pennsylvania.  See 28 U.S.C. § 1441(b).

In a memorandum and order, dated November 1, 2012, the Court denied the plaintiffs' motion to remand.  See Moore v. Johnson & Johnson, 907 F. Supp. 2d 646 (E.D. Pa. 2012).  The

-2-

Court determined that McNEIL-PPC's principal place of business was in Skillman, New Jersey, not Pennsylvania, making it a New Jersey citizen and permitting it to remove the Moores' lawsuit to this court.  Id. at 659-61.  The Court also found that Weldon had been fraudulently joined as a defendant and his citizenship could be ignored for jurisdictional purposes.  Id. at 663-65.

On November 14, 2012, the plaintiffs filed their motion for reconsideration.  They argue that the Court erred as a legal and factual matter when it concluded that McNEIL-PPC's nerve center is in New Jersey where executives associated with J&J's Family of Consumer Companies are located, as opposed to Fort Washington, where the president and vice president of McNEIL-PPC have their offices.  In the alternative, the plaintiffs seek interlocutory appeal of this Court's decision and certification of the question of McNEIL-PPC's citizenship.  The plaintiffs also ask this Court to reconsider its determination that Weldon was fraudulently joined as a defendant.

To ensure that it fully understood McNEIL-PPC's place within J&J's larger corporate structure and decisionmaking apparatus, and after consulting with the parties, the Court determined that it would be useful to hold an evidentiary hearing to gather additional evidence on the issue of McNEIL-PPC's principal place of business.  To accommodate the parties' schedule, the Court held that hearing on July 9, 2013.  At the

-3-

hearing, the Court received documentary evidence and heard
testimony from Raj Vaswani, an attorney and assistant secretary
for McNEIL-PPC, and Gregory Herlan, the current president of
McNEIL-PPC and the vice president and CFO of J&J's Family of
Consumer Companies in North America.

## II. Findings of Fact[1]

---

[1] The Court's findings of fact are based on the affidavits,
deposition testimony, and exhibits that the Court previously
considered in issuing its November 1, 2012 memorandum and order,
as well as the testimony provided at the July 9, 2013 evidentiary
hearing and exhibits submitted by the parties at that hearing and
in conjunction with their post-hearing briefs.  In making its
findings of fact, the Court has assessed the credibility of the
witnesses who testified at the hearing.

The Court's factual findings are based on facts in existence
as of January 30, 2012, the date of removal, which the parties
agree is the relevant date for determining whether a defendant is
a citizen of the forum state barred from removing the action to
federal court within that jurisdiction.  See 7/9/13 Hr'g Tr. at
25-26.  The "forum defendant" rule, as it is called, is
established by the removal statute, and represents an additional
procedural requirement for removal above and beyond the
requirements for federal subject matter jurisdiction.  See 28
U.S.C. § 1441(b); Korea Exch. Bank v. Trackwise Sales Corp., 66
F.3d 46, 50 (3d Cir. 1995).  The version of § 1441(b) applicable
when the Moores filed this suit, as well as the current version,
states that an action is not removable if any of the "properly
joined and served" defendants "is" a citizen of the forum state,
suggesting that the operative date for purposes of the forum
defendant rule is the date of removal.  As of that date, McNEIL-
PPC was a citizen of New Jersey only.  Based on the present
factual record, the Court reaches the same conclusion even if it
considers McNEIL-PPC's citizenship as of December 29, 2011, the
date the Moores filed their lawsuit in the Court of Common Pleas.
The only change to McNEIL-PPC's structure between those two dates
is that oversight of its over-the-counter business unit shifted
from J&J executive Patrick Mutchler, who worked out of New
Brunswick, New Jersey and whose management team included

-4-

McNEIL-PPC is a wholly owned subsidiary of J&J.[2]  It is
one of several J&J subsidiaries that make and sell a number of
consumer products.  McNEIL-PPC has four principal officers:
President Denice Torres, Vice President/CFO Kirk Barton;
Secretary Desiree Ralls-Morrison; and Treasurer Gregory Herlan.[3]
Torres and Barton are based in Fort Washington, Pennsylvania, the
site of the McNeil Consumer Healthcare Division's production
facility.  Herlan's office is in Skillman, New Jersey, and Ralls-
Morrison's office is in New Brunswick, New Jersey.[4]  5/2/12

_____

individuals in New Brunswick and Fort Washington, Pennsylvania,
to a group of executives based exclusively in Skillman, New
Jersey.  See 7/9/13 Hr'g Tr. at 26-28.  In either case, no
Pennsylvania-based individuals coordinated and controlled the
overall activities of McNEIL-PPC.

     Although the Court analyzes the facts as they were on
January 30, 2012, it will generally describe the relevant facts
in the present tense.

     [2] J&J indirectly owns McNEIL-PPC through several intervening
subsidiaries.  3/20/12 Vaswani Supp. Decl. ¶ 5; 5/2/12 Vaswani
Dep. at 63-64.

     [3] In its initial opinion, the Court found that McNEIL-PPC's
secretary was Shane Freedman, who works in Fort Washington.
Moore, 907 F. Supp. 2d at 653.  It now appears that Freedman did
not replace Ralls-Morrison as secretary until after this action
had been removed.  See PX 4 (4/11/12 McNEIL-PPC Statutory Records
- Company Resolution).  At some point in 2013, Herlan took over
as president of McNEIL-PPC.  7/9/13 Hr'g Tr. at 10.

      "PX" and "DX" refer to the exhibits submitted by the
plaintiffs and the defendants, respectively, at the evidentiary
hearing.

     [4] A business record on file with the State of New Jersey
states that Herlan's address is in Fort Washington, Pennsylvania.
PX 1.  There is nothing in the evidentiary record reflecting the

Vaswani Dep. at 65; PX 4; 7/9/13 Hr'g Tr. at 9, 89.

McNEIL-PPC's bylaws vest its president and vice president with authority to supervise the business of the entire company. PX 3 (Bylaws), art. IV, § 3. In practice, however, the McNEIL-PPC officers do not exercise the authority in the manner set forth by those bylaws. Torres and Barton oversee only the McNeil Consumer Healthcare Division of McNEIL-PPC, which makes and distributes over-the-counter ("OTC") medications, such as Tylenol, Motrin, and Benadryl, and operates out of a facility in Fort Washington, Pennsylvania. They do not have involvement in the production, marketing, and sale of McNEIL-PPC's other products, which include Listerine mouthwash, Reach dental products, feminine hygiene products bearing the OB, Stayfree, and Carefree labels, and Rogaine. 7/9/13 Hr'g Tr. at 30-31, 34-35; 3/20/12 Vaswani Supp. Decl. ¶ 3; 5/2/12 Vaswani Dep. at 71, 89-91; 5/8/12 Vaswani Dep. at 52-53, 55-56, 60, 68.

Instead, the management functions for McNEIL-PPC as a whole are carried out by executives associated with an operating group that encompasses multiple J&J subsidiaries that produce consumer products.

J&J organizes its subsidiaries into three main sectors: pharmaceuticals, medical devices, and consumer businesses.

source of this information or that the information was ever confirmed by McNEIL-PPC.

-6-

Companies within the consumer businesses sector are part of the global Family of Consumer Companies ("FCC"). The FCC is not a legal entity, but rather a functional operating group. 7/9/13 Hr'g Tr. at 11-12, 59. Broad, overarching responsibility for the FCC is exercised by a worldwide Global Operating Committee ("GOC"), headed by Jesse Wu, a senior executive employed by J&J at its global headquarters in New Brunswick, New Jersey. 7/9/13 Hr'g Tr. at 11-12, 18-19, 59; DX 1 (Org. Chart).

        The FCC is further broken down into regional units, including a regional unit for North America ("FCC-North America"). The subsidiaries in the FCC-North America are McNEIL-PPC; Johnson and Johnson Consumer Companies, Inc. ("JJCC"); the Neutrogena Corporation; Wellness and Prevention; and Johnson and Johnson, Inc., a Canadian corporation ("J&J Canada"). JJCC owns Band-Aid brand products, Neosporin, and certain skin care products under the Aveeno, Roc, and Clean and Clear labels. Neutrogena, formerly a separate company, was acquired by J&J and makes, owns, sells, distributes, and markets a variety of skin care products under its own label. 7/9/13 Hr'g Tr. at 12-13, 15-17, 51, 107; DX 1.

        The FCC-North America unit is run by a group of senior executives that directs and sets business targets for the subsidiaries within that regional cluster of consumer businesses. The FCC-North America executives are employed by various J&J

entities, and none is an employee of McNEIL-PPC.  7/9/13 Hr'g Tr.
at 9-10, 20-21, 49, 51; 5/2/12 Vaswani Dep. at 121; Pls.' 5/21/12
Supp. Br., Ex. A (J&J Directory Entries).

     This executive team is headed by Roberto Marques, the
North American company group chairman for the consumer
businesses.  7/9/13 Hr'g Tr. at 13, 59.  In that role, Marques
exercises "overall responsibility for the consumer businesses in
North America," and also sits on the GOC.  5/8/12 Vaswani Dep. at
76.  Torres, the president of McNEIL-PPC, reports to Marques.  DX
2 (J&J Directory Entry - D. Torres); 7/9/13 Hr'g Tr. at 33-34.

     Assisting Marques are Gregory Herlan, the vice
president of finance and CFO for the FCC-North America; Caitlin
Pappas, the chief sales executive; Roberto DiBernardini, the
senior human resources executive for the region; and Larry
Montes, the FCC-North America's executive in charge of health
care compliance.[5]  All five of these executives have their
principal offices in Skillman, New Jersey.  They also meet at
least monthly, typically in Skillman.  The FCC-North America
executives ultimately report to Jesse Wu and the GOC.  7/9/13
Hr'g Tr. at 9, 13, 18, 20-21, 37; 5/2/12 Vaswani Dep. at 104-05,
112-15.

     To carry out the business goals set by the FCC-North
America executive team and manage daily operations of the

---

     [5] Since the time this suit was removed, Montes has left that
position.  7/9/13 Hr'g Tr. at 13-14.

consumer businesses, the FCC-North America is also subdivided
into several business units, each overseeing a variety of related
consumer brands and products.  These business units also do not
constitute separate legal entities and, for the most part, do not
correspond to the legal entity structure of subsidiaries.  Some
of the business units span across subsidiaries within the larger
regional grouping and manage the products of multiple companies.
7/9/13 Hr'g Tr. at 21-25.

        The business units are run by management boards that
carry out the day-to-day functions for the businesses and brands
within their units.  The business unit management boards are
separate from both the FCC-North America executive group and the
boards of directors for the legal entities within the FCC-North
America.  Composition of the management boards mirrors that of
the FCC-North America executive team.  The boards have
individuals in charge of each of the various operational aspects
covered by the members of the overarching executive team and who
report to the FCC-North America executive who directs their
corresponding facet of the business.  The various business units
also produce profit-and-loss statements for managerial review.
Wellness and Prevention and J&J Canada are stand-alone business
units.  The other business units are organized into the following
categories: (1) over-the-counter; (2) consumer health care; and
(3) skin.  Id. at 17, 21-25, 64-65; DX 1.

The OTC business unit is housed wholly within McNEIL-PPC. The OTC business unit is operated through the McNeil Consumer Healthcare Division of McNEIL-PPC headed by Torres and Barton in Fort Washington, and oversees manufacture and distribution of the company's medication brands, including Tylenol and Motrin. The unit has no responsibility for other brands produced by McNEIL-PPC, such as the consumer products Listerine, Rogaine, and Reach. Barton, as the top financial officer handling McNEIL-PPC's OTC products, was hired by and reports to Herlan as the CFO for the FCC-North America. 7/9/13 Hr'g Tr. at 22, 29-31, 34-35; DX 1.

Each of the other two units coordinates the activities of multiple subsidiaries within the FCC-North America. The consumer health care business unit manages the daily activities of brands owned by McNEIL-PPC, including Visine, Listerine, and Splenda, and JJCC, including Band-Aid and Neosporin. The consumer health care unit is run by Peter Luther out of offices in Skillman. Finally, the skin business unit manages all Neutrogena brands, as well as the Aveeno, Roc, and Clean and Clear products sold by JJCC. This unit is also based in Skillman and is headed by an executive named Jeff Smith. 7/9/13 Hr'g Tr. at 16-17, 23, 29, 34; DX 1.

Based on this structure, no one business unit is responsible for all of the brands owned and sold by McNEIL-PPC.

The only groups exercising oversight for all of McNEIL-PPC's activities are the FCC-North America executive team and higher levels of corporate management.  7/9/13 Hr'g Tr. at 24, 74, 98.

III. <u>Analysis</u>

        Considering first the plaintiffs' motion for reconsideration, the Court finds that the plaintiffs have not provided cause for it to deviate from its initial decision regarding McNEIL-PPC's citizenship and the viability of the claims against Weldon.  The plaintiffs have not established that the Court clearly erred as a legal matter or is precluded by a change in intervening law from considering the activities of individuals at distinct, but related, corporate entities to determine McNEIL-PPC's nerve center.  Proceeding from that starting point, the Court finds that the evidence adduced at the hearing and submitted by the parties with their briefing confirms its original conclusion that McNEIL-PPC has its principal place of business in Skillman, New Jersey.  The plaintiffs also have not offered any basis for the Court to reconsider its conclusion that Weldon was fraudulently joined.

        Additionally, the Court finds that the requirements for interlocutory appeal have not been met.

A.    Reconsideration of McNEIL-PPC's Principal Place of
      Business

        The purpose of a motion for reconsideration is to
correct manifest errors of law or fact or present newly
discovered evidence.  Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d
Cir. 2010) (per curiam).  A motion for reconsideration is not a
proper vehicle for rearguing a position already presented to and
rejected by the court.  Id.; United States v. Jasin, 292 F. Supp.
2d 670, 676 (E.D. Pa. 2003).  Accordingly, a motion for
reconsideration will be granted where a party demonstrates one of
the following grounds: (1) an intervening change in controlling
law; (2) the availability of new evidence; or (3) the need to
correct a clear error of law or prevent manifest injustice.
Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d
669, 677 (3d Cir. 1999).


        1.    Applicable Law

        In its November 1, 2012 opinion, the first issue the
Court needed to address in determining McNEIL-PPC's principal
place of business was establishing the individuals relevant to
locating the company's "nerve center."  In Hertz Corp. v. Friend,
the Supreme Court clarified that a corporation's principal place
of business is "the place where the corporation's high level
officers direct, control, and coordinate the corporation's

                              -12-

activities," i.e., its nerve center.  559 U.S. 77, 80 (2010).

Recognizing that Hertz focused on ascertaining the "actual"

center of corporate control and coordination, however, and

relying on several pre-Hertz court of appeals cases, including

the Third Circuit Court of Appeals' decision in Mennen Co. v.

Atlantic Mutual Insurance Co., 147 F.3d 287 (3d Cir. 1998), the

Court concluded that "the principal place of business inquiry may

peer beyond a party's corporate form and look to the activities

of individuals who actually control and direct the corporation

from distinct, but related, corporate entities."[6]  Moore, 907 F.

Supp. 2d at 659.

        The plaintiffs now ask the Court to revisit its

decision.  In short, they argue that the Court misreads Hertz,

given that it speaks of the nerve center test as turning on the

activities of "*a corporation's . . . officers*" and the fact that

it extolled the value of easily administrable jurisdictional

rules.  They also argue that the precedent on which the Court

relied is no longer good law in the wake of Hertz.

        The plaintiffs raised these very same legal arguments

_____

        [6] The Court also considered two opinions of the Fifth
Circuit, Toms v. Country Quality Meats, Inc., 610 F.2d 313 (5th
Cir. 1980), and J.A. Olson Co. v. City of Winona, 818 F.2d 401
(5th Cir. 1987).  In those cases, the Fifth Circuit determined
that a corporation's nerve center could be located outside the
corporation and exist wherever operational control is actually
maintained.  J.A. Olson, 818 F.2d at 412; Toms, 610 F.2d at 315-
16.

in their original briefing, and the Court considered and rejected the plaintiffs' position for the reasons outlined in its prior opinion.  Namely, the issues actually presented in Hertz did not include who among a corporation's leadership could form its nerve center; Hertz displayed a pragmatic focus on finding the actual center of corporate control; and, although Hertz displaced the principal place of business tests utilized in Mennen and other cases, it did not reject their guiding principle that a corporation's principal place of business can be the location where individuals, even those affiliated with a different entity in the corporate family, carry out the party's jurisdictionally relevant activities.

The plaintiffs' renewed attempt to prevail on these same arguments does not convince the Court that it made a clear error of law or that its original decision is manifestly unjust.[7]

---

[7] In particular, the plaintiffs' citation to Astra Oil Trading NV v. Petrobras America Inc., No. 09-1274, 2010 WL 3069793, at *6-7 (S.D. Tex. Aug. 4, 2010), an opinion by a district court within the Fifth Circuit, does not cause the Court to question its reliance on the Fifth Circuit Court of Appeals' decision in Toms.  In Astra Oil Trading, the district court declined to rely on Toms to find that the plaintiff, a subsidiary, shared a nerve center with its parent corporation. Id. at *6-7.  Contrary to the plaintiffs' suggestion, the district court in Astra Oil Trading did not conclude that Hertz had overruled Toms.  It simply found, based on the evidence before it, that the subsidiary's CEO actually directed and controlled the subsidiary's activities, providing it with a nerve center separate and apart from its parent company.  Id. at *7. Far from demonstrating the invalidity of Toms post-Hertz, if anything, the district court's efforts to engage Toms on its own terms demonstrates that it still has precedential value.

Nor is their disagreement with the Court's opinion, standing alone, a sufficient basis for seeking reconsideration of the Court's determination as to the proper scope of the Hertz nerve center analysis.  See Lazaridis, 591 F.3d at 669; Jasin, 292 F. Supp. 2d at 676.

The plaintiffs also argue that the Fourth Circuit in Central West Virginia Energy Co. v. Mountain State Carbon, LLC reversed a district court ruling similar to this Court's opinion denying remand, finding that the district court erred by considering the "daily management" activities of employees in West Virginia when determining a company's nerve center.[8]  636 F.3d 101, 106 (4th Cir. 2011).  The Fourth Circuit found the company's "concession that its officers direct[ed] the company's high-level decisions from Dearborn, Michigan" to establish conclusively that its nerve center was located in that city.  Id. The court also noted that the word "management" does not anywhere appear in the Hertz opinion.  Id.  The plaintiffs latch on to this observation to contend that this Court's prior decision was in error.

Although this Court used the words "management" and "managers" in its earlier opinion when discussing the focal point

---

[8] Notably, although the Court did not discuss Central West Virginia Energy Co. in its November 1, 2012 opinion, the parties analyzed that case in their briefs on the original motion to remand and the Court considered that case prior to issuing its opinion.

of the nerve center test, it did not do so in the manner deemed
incorrect by the Fourth Circuit.  The Court's prior opinion did
not look to "the locus of day-to-day activities," or, in the
words of the district court that the Fourth Circuit reversed, the
location of "daily management" by company employees.  Id. at 106
(quotation marks omitted).  It spoke of "management" in terms of
the individuals who make significant corporate decisions and set
corporate policies for McNEIL-PPC, what Central West Virginia
Energy considered the "very 'direction and control' at the heart
of the Supreme Court's 'nerve center' discussion in Hertz."  Id.
at 105.  In that regard, the Court's finding that the FCC-North
America executive team constitutes McNEIL-PPC's nerve center is
fully in line with Central West Virginia Energy's placement of
the nerve center within a corporate hierarchy.

       In any event, the Fourth Circuit's conclusion that the
company before it had its nerve center in Dearborn, Michigan
where the bulk of its officers worked is not particularly
relevant to this case.  The Central West Virginia Energy court,
unlike the Court in this case, simply was not faced with the
argument that the company's own officers did not have overarching
control of the company.

       A more instructive case is the Third Circuit's recent
precedential decision, Johnson v. SmithKline Beecham Corp., in
which it recognized that a corporation's nerve center may lie

outside its corps of officers.  In Johnson, the Third Circuit considered the principal place of business for GlaxoSmithKline Holdings ("GSK Holdings"), a holdings company.  The Court of Appeals upheld the district court's determination that GSK Holdings' officers in London and Philadelphia did not direct its activities, and that the company was instead controlled by its directors during regular meetings at GSK Holdings' office in Wilmington, Delaware.  Accordingly, GSK Holdings' nerve center was in Wilmington, not another locale.  Nos. 12-2561 through 12-2565, 2013 WL 2456043, at *11-14 (3d Cir. June 7, 2013).

        In reaching this conclusion, the Johnson court rejected a formalistic reading of Hertz that would limit the nerve center to a company's officers in favor of a more pragmatic construction of the nerve center test that focuses on the actual center of coordination and control.  As the Third Circuit stated, "GSK Holdings' sole function is to hold assets. . . .  When, as here, the evidence suggests that the board of directors actually controlled that activity, we do not think that Hertz requires us to ignore that fact and look instead to the location of certain corporate officers."  Id. at *14 n.21.  The court expressly rejected the notion that its conclusion was based on an application of the nerve center test that was unique to holding companies.  The court found that it was "faithfully applying Hertz's instruction to identify 'the actual center of direction,

-17-

control, and coordination' of a corporation." Id. (quoting
Hertz, 559 U.S. at 93). It simply found that the nerve center
lay elsewhere in the corporation.

Johnson confirms that Hertz is not as formalistic as
the plaintiffs contend. When "the facts . . . suggest that [a]
particular corporation did not vest the relevant decision-making
in its officers," those officers do not comprise the
corporation's nerve center. Id. This Court's conclusion that
executives of a related entity may constitute a corporation's
nerve center sits comfortably with the Third Circuit's reasoning
and holding in Johnson.

In short, the plaintiffs have not provided the Court
with reason to reconsider its interpretation of Hertz and the
other cases cited in its prior opinion. Indeed, Johnson
demonstrates that a court's nerve center analysis need not
woodenly focus on a corporation's officers and can take stock of
corporate realities. Accordingly, the Court adheres to its
initial conclusion that it may consider actors beyond McNEIL-
PPC's officers in determining McNEIL-PPC's nerve center.

2. Application

Applying the foregoing principle to the facts at hand,
the Court again finds that McNEIL-PPC's principal place of
business is Skillman, New Jersey. That was the Court's

-18-

conclusion after its initial review of the record, and the facts adduced at the evidentiary hearing only reinforce this conclusion.

McNEIL-PPC's bylaws, which grant McNEIL-PPC's highest-ranking officers, President Denice Torres and Vice President Kirk Barton, authority to run the entire company, do not reflect the actual state of affairs.  Those officers manage only the McNEIL-PPC division devoted to the company's OTC products.  The day-to-day operations associated with McNEIL-PPC's other products are managed by a separate group of executives as part of the consumer health care business unit headed by Peter Luther and located in Skillman, New Jersey.  Thus, McNEIL-PPC's activities are divided between two business units.  Neither unit's managers coordinates or controls the affairs of McNEIL-PPC as a whole.  In fact, it is clear from the evidentiary record that, as a practical matter, no one within McNEIL-PPC itself sets the corporate priorities for the entire company.

The group of individuals that actually fulfills these functions is the executive team for the FCC-North America, which oversees all consumer products owned and distributed by five J&J subsidiaries in North America.  These executives, who are all located in and generally meet in Skillman, set business priorities and exercise managerial direction over McNEIL-PPC and the other J&J subsidiaries within their regional unit.  Thus,

Skillman is the center of corporate control and direction for
McNEIL-PPC.

      The evidence cited by the plaintiffs does not undermine
this finding.  The plaintiffs point out that certain documents on
file with the Secretaries of State of New Jersey and Pennsylvania
list McNEIL-PPC's officers as having addresses in Fort
Washington, Pennsylvania and that, in 2011, the treasurer of
McNEIL-PPC entered into a consent decree with the U.S.
government.  The plaintiffs raised both facts in prior briefing,
and the Court found that evidence unavailing then.  In its
earlier opinion, the Court specifically addressed the business
records' minimal probative value.  The consent decree, which the
Court did not specifically discuss, also sheds little light on
the location of McNEIL-PPC's nerve center.  The fact that McNEIL-
PPC's treasurer executed a document on the company's behalf on
one occasion in 2011 does not reflect who controls the company on
a consistent basis and does not counterbalance the other evidence
in the record suggesting that no McNEIL-PPC officer exercises
overarching decisionmaking for the company.

      The Court does note that some tension exists between
its findings in this case and J&J's representation, in other
contexts, that its subsidiaries maintain control of their daily
operations.  First, on its website, J&J states that it takes a
"[d]ecentralized [m]anagement approach," and that "each of [its]

operating companies functions as its own small business." PX 2.
Second, in a separate California state court lawsuit, Douglas
Chia, a J&J in-house attorney, testified that J&J's subsidiary
companies "are autonomously operated and managed by their own
employees." Chia also stated that each company has its own board
of directors, who authorize "certain large corporate actions,"
and officers, who hire employees and make "day-to-day business
decisions." PX 5 (4/29/10 Chia Dep. at 126-27, Trejo v. Johnson
& Johnson, No. YC058023 (Cal. Super. Ct.)).

Any tension is not sufficient to cast doubt on the
Court's ultimate conclusion that McNEIL-PPC is chiefly run by
high-level executives in Skillman, New Jersey. Both J&J's
website statement and Chia's deposition testimony are generic
statements as to how J&J and its subsidiaries operate. Neither
focuses on the operations of McNEIL-PPC or other companies within
the FCC-North America. Even if it is true that other J&J
subsidiaries–even most J&J subsidiaries–operate independently,
McNEIL-PPC does not function under that paradigm. Moreover, it
is not clear that the "day-to-day business decisions" referenced
by Chia are the sort of high-level direction, control, and
coordination with which Hertz was concerned. See Cent. W. Va.
Energy, 636 F.3d at 105 (noting that Hertz nerve center analysis
does not turn on the location of those who control "day-to-day
operations" (quotation marks omitted)).

A different situation would be presented if Denice
Torres and the other McNEIL-PPC officers actually exercised
control over all McNEIL-PPC brands and activities but McNEIL-PPC
was also part of the FCC-North America.  Under those
circumstances, the Court would need to determine which collection
of managers exercised the coordination and control of which the
Supreme Court spoke in <u>Hertz</u>.  That is not the case, however.
The evidence in the record demonstrates that McNEIL-PPC's
officers, whatever the authority conferred on them by the bylaws,
do not manage all of McNEIL-PPC's activities.  The individuals
who coordinate and control McNEIL-PPC's business are based in
Skillman, and that is McNEIL-PPC's nerve center.

As the Court previously concluded, McNEIL-PPC is a New
Jersey citizen and was permitted to remove this suit.


B.   <u>Claims Against Weldon</u>

The plaintiffs also fail to establish that the Court
should reconsider its decision to dismiss Weldon as a
fraudulently joined defendant.

In its November 1, 2012 memorandum, the Court reviewed
the allegations in the complaint that Weldon knew about the poor
conditions at J&J facilities, including the Fort Washington plant
that produced the Children's Tylenol at issue in this case, and
that he wrongly sought to minimize any danger posed by the

products manufactured at that facility in testimony before
Congress.  The Court concluded that these allegations at most
established that Weldon should have known of the possibility that
J&J's products would injure the public, not that he "specifically
directed" the manufacturing, distribution, or recall of allegedly
defective Children's Tylenol.  <u>Moore</u>, 907 F. Supp. 2d at 663
(quoting <u>Wicks v. Milzoco Builders, Inc.</u>, 470 A.2d 86, 90 (Pa.
1983)).  Weldon's conduct did not rise to the level of
misfeasance necessary to prove officer liability under
Pennsylvania law.  The Court also concluded that, even if Weldon
made statements to Congress that concealed or misrepresented
problems with J&J OTC medications, he did so after the death of
the plaintiffs' son, River Moore; his statements could not have
contributed to River's injury.  <u>Id.</u> at 664.

        The plaintiffs now rely on those same allegations in
arguing that Weldon is personally responsible for the injuries
they have suffered.  The Court reaches the same conclusion that
it did in its initial opinion; the plaintiffs have not made out a
colorable claim of liability against Weldon based on his
individual actions as a J&J executive.

        The plaintiffs' citation to two new pieces of evidence
also does not present the Court with cause to revisit its
fraudulent joinder decision with respect to Weldon.  The
plaintiffs offer proof that, nearly a year before Weldon

-23-

testified before Congress, McNEIL-PPC received notice that a four-year-old boy died after taking Tylenol Infant Drops, and that Johnson & Johnson Pharmaceutical Research & Development, L.L.C. acknowledged receipt of the report.  <u>See</u> Pls.' 11/13/12 Mot., Exs. L-M.

   First, this evidence was not incorporated in the "complaint at the time of removal," which remains the focus of the Court's fraudulent joinder analysis.  <u>Batoff v. State Farm Ins. Co.</u>, 977 F.2d 848, 851-52 (3d Cir. 1992) (quotation marks and citation omitted).  Second, this report relates to Tylenol Infant Drops, not Children's Tylenol, the product that the plaintiffs claim harmed River Moore.  Third, neither piece of evidence demonstrates that Weldon, in particular, was made aware of the dangers posed by J&J OTC products.  Fourth, and most importantly, this evidence does not demonstrate that Weldon engaged in the misfeasance required to hold a corporate officer liable in tort.  <u>See</u> <u>Wicks</u>, 470 A.2d at 90.


  C. <u>Interlocutory Appeal</u>

   The Court next addresses the plaintiffs' request for interlocutory appeal of its November 1, 2012 order, so that the Court of Appeals may consider the Court's legal and factual findings relevant to McNEIL-PPC's principal place of business.

   Interlocutory appeal should be reserved for

-24-

"exceptional cases." <u>Caterpillar Inc. v. Lewis</u>, 519 U.S. 61, 74 (1996) (quotation marks and citation omitted).  A district court may certify an order for interlocutory appeal where it is "of the opinion" that (1) the order "involves a controlling question of law"; (2) as to which there is "substantial ground for difference of opinion"; and (3) an immediate appeal "may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  The statute authorizing interlocutory appeals leaves the certification decision to the discretion of the district court.  <u>See</u> <u>Bachowski v. Usery</u>, 545 F.2d 363, 368 (3d Cir. 1976); <u>Douris v. Schweiker</u>, 229 F. Supp. 2d 391, 408 (E.D. Pa. 2002).

The Court finds that interlocutory appeal is not warranted in this case.  Even assuming that this case involves a controlling question of law, the plaintiffs have not sufficiently demonstrated that there exist substantial grounds for a difference of opinion as to the Court's interpretation of <u>Hertz</u>.

The plaintiffs have demonstrated no intracircuit split on this issue.  The plaintiffs are incorrect that the Court's prior decision conflicts with the approach taken by another judge of this court in <u>EverNu Technology v. Rohm & Haas</u>.  In <u>EverNu</u>, the court found that the subsidiary at issue operated separately from its corporate parent and that its officers made all but "exceptional" decisions on their own.  No. 10-2635, 2010 WL 3419892, at *4 (E.D. Pa. Aug. 26, 2010).  The court refused to

-25-

impute the parent's principal place of business in Midland, Michigan to the subsidiary simply because "the most important policy and governance decisions" were made by the parent company in Michigan.  Id.  If it were otherwise, reasoned the EverNu court, every subsidiary's nerve center would be the location of its parent.  Id.

This Court's earlier decision does not conflict with EverNu because it did not equate McNEIL-PPC's principal place of business with that of J&J.  The Court found that McNEIL-PPC's nerve center is in Skillman and saw no reason to question the defendants' position that J&J's nerve center is in New Brunswick. Moore, 907 F. Supp. at 661.  Just because the Court concluded that McNEIL-PPC's principal place of business is dictated by the location of particular J&J executives does not mean that the Court elided the nerve centers of J&J and its subsidiary.  The Court has at all times looked to McNEIL-PPC's nerve center. EverNu did not address the legal question at issue here.

For that matter, the plaintiffs have not cited any case, pre- or post-Hertz, rejecting the Court's legal conclusion that a company's nerve center may exist outside the corporation. Indeed, the reasoning of case law predating Hertz, such as Mennen, J.A. Olson, and Toms, as well as the Third Circuit's recent decision in Johnson suggest that nerve center analysis may extend beyond the officers of a party corporation.  At most, the

-26-

plaintiffs have demonstrated a lack of authoritative post-<u>Hertz</u> case law on this precise issue.  The novelty of a legal issue does not demonstrate that there exist substantial ground for a difference of opinion, however.  <u>See</u> <u>Couch v. Telescope Inc.</u>, 611 F.3d 629, 634 (9th Cir. 2010); <u>Union Cnty. v. Piper Jaffray & Co., Inc.</u>, 525 F.3d 643, 647 (8th Cir. 2008) (per curiam); <u>In re Flor</u>, 79 F.3d 281, 284 (2d Cir. 1996) (citing <u>Max Daetwyler Corp. v. Meyer</u>, 575 F. Supp. 280, 283 (E.D. Pa. 1983)).

Furthermore, immediate appeal will not lead to a speedy resolution of this matter, as the issue is only whether this case should be resolved by the federal or Pennsylvania courts.  <u>See Koken v. Viad Corp.</u>, No. 03-5975, 2004 WL 1240672, at *1 (E.D. Pa. May 11, 2004).

The Court is mindful that other cases involving the same defendants and the same legal issue are before other judges of this court.  Nevertheless, the plaintiffs have not demonstrated that immediate appeal will advance the termination of this litigation.


IV.  <u>Conclusion</u>

For the foregoing reasons, the Court will deny the plaintiffs' motion for reconsideration or interlocutory appeal of the Court's November 1, 2012 memorandum and order denying the plaintiffs' motion to remand.  An appropriate order shall issue

separately.